IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
PADUCAH

| | |
|---|---|
| VERITIV OPERATING COMPANY, | ) |
| *Plaintiff,* | ) ) ) |
| v. | ) ) Case No. 5:21-cv-170 (TBR) |
| PHOENIX PAPER WICKLIFFE, LLC, | ) ) |
| *Defendant.* | ) ) |

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court upon Plaintiff Veritiv Operating Company's Motion for Temporary Restraining Order and Preliminary Injunction, (Mot. for TRO and PI), Dkt. 9. Defendant Phoenix Paper Wickliffe, LLC has responded, (Resp.), Dkt. 15. Veritiv has replied, (Reply), Dkt. 20. Veritiv has also filed a Supplemental Motion for Injunctive Relief, (Suppl. Mot.), Dkt. 24. As such, briefing is complete and this motion is ripe for adjudication.

Also before the Court is Veritiv's Motion to Expedite Limited Discovery, (Mot. for Disc.), Dkt. 10.

For the reasons that follow, Veritiv's Mot. for TRO and PI, Dkt. 9, is **DENIED** to the extent that it seeks a TRO, and the Court **SETS A HEARING** on the Mot. for TRO and PI, Dkt. 9, to the extent that it seeks a preliminary injunction. Additionally, Veritiv's Suppl. Mot., Dkt. 24, is **DENIED AS MOOT** and Veritiv's Mot. for Disc., Dkt. 10, is **DENIED AS MOOT**.

**I.    FACTUAL BACKGROUND**

This case involves a business relationship between Plaintiff and Defendant.

Plaintiff, Veritiv, describes itself as a national supplier and distributor of packaging systems, commercial printing papers, business imaging papers, and other paper products. *See*

1

Verified Complaint, (Compl.), ¶ 8. Veritiv obtains its paper products from various manufacturers. *See id.* ¶ 28. One of those paper manufacturers, Phoenix, is the Defendant to this dispute. *See id.* ¶¶ 32–33.

According to the Complaint, Phoenix sold paper products to Veritiv, and Veritiv marketed and resold those paper products to its customers. *See id.* ¶ 33. As part of that relationship, Veritiv claims that it regularly submitted Purchase Orders to Phoenix. *See id.* ¶ 57. Veritiv maintains that each of these Purchase Orders contained confidential information. *See id.* ¶¶ 60–61, 57–58. Specifically, the Complaint states that Veritiv's Purchase Orders disclosed the following: customer quantity needs; customer purchasing specifications; customer requirements; Veritiv's shipping terms; Veritiv's pricing with Phoenix; and the payment terms from Phoenix to Veritiv. *See id.* ¶ 73. According to the Complaint, Veritiv "closely guard[s]" all of this information, meaning that it password-protects all of these files and only makes them available on a need-to-know basis. *Id.* ¶¶ 21–23.

Veritiv further alleges that each of its manufacturers, including Phoenix, were required to keep Veritiv's confidential information secret. *See id.* ¶¶ 36–46. Veritiv identifies two documents as the source of this obligation. *See id.* First, Veritiv asserts that Phoenix was required to accept Veritiv's Terms and Conditions, which have a confidentiality provision that covers "[a]ll specifications, data and other information furnished by [Veritiv], or its agents, to [Phoenix] in connection with these Terms . . . ." *Id.* ¶¶ 37–41. Second, Veritiv claims that Phoenix was bound by a Supplier Code of Conduct, which required manufacturers to "meet their contractual obligations" and "disclose any potential conflicts of interest." *Id.* ¶¶ 42–46.

Allegedly, on October 18, 2021, Phoenix informed Veritiv that Phoenix was moving one of Veritiv's customers to another distributor.[1] *See id.* at 77; *see also* Mot. for TRO and PI at 10. That customer was Three Z, which Veritiv states was its sixth largest customer for U.S. print sales. *See* Compl. ¶ 66. Veritiv also emphasizes that, at that time, Three Z comprised approximately one third to one half of Veritiv's purchases from Phoenix. *See id.* ¶ 67. The Complaint asserts that one day later, on October 19th, Three Z informed Veritiv that Phoenix had disclosed the terms of payment that Veritiv had with Phoenix, and, generally, that was why Phoenix was moving the account. *See id.* ¶ 78. Veritiv claims that it subsequently reached out to Phoenix on multiple occasions to express concerns that Phoenix was using confidential information to interfere with Veritiv's customer relationships. *See id.* ¶¶ 82–92. According to the Complaint, Phoenix rebuffed Veritiv and the relationship between the parties is now fraught with mistrust. *See id.* Veritiv now fears that Phoenix will direct more business away from Veritiv. *See* Suppl. Mot.

## II.   LEGAL STANDARD

To determine whether to grant a temporary restraining order or preliminary injunction, the district court is required to consider four factors: " '(1) the plaintiff['s] likelihood of success on the merits; (2) whether the plaintiff may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of an

---

[1] According to the Complaint, this conversation between Veritiv and Phoenix occurred on October 20th, not October 18th. *See* Compl. ¶ 77. However, Veritiv's Mot. for TRO and PI states that this conversation occurred on October 18th. *See* Mot. for TRO and PI at 10. It appears to the Court that Veritiv meant to write October 18th, not October 20th, in the Complaint. The Complaint states that on October 19th Veritiv spoke with Three Z about its decision to switch distributors, *see* Compl. ¶ 78, and that on the next day, October 20th, Veritiv spoke with Phoenix's CEO on the phone, *see id.* ¶ 82. Based on this timeline, the Court believes that the first conversation between Veritiv and Phoenix occurred on October 18th. And importantly, this timeline also makes more sense because the Complaint is otherwise pled in chronological order, and deciding that this conversation occurred on October 20th would interrupt that chronology. *See id.* Ultimately, however, whether this conversation occurred on October 18th or October 20th does not affect the Court's analysis in any way, *see infra*. The Court simply points out the discrepancy to avoid any further confusion.

injunction upon the public interest.' " *Abney v. Amgen, Inc.*, 443 F.3d 540, 546 (6th Cir. 2006) (quoting *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty.*, 274 F.3d 377, 400 (6th Cir. 2001)). "Balancing all four factors is necessary unless fewer are dispositive of the issue." *Katchak v. Glasgow Indep. Sch. Sys.*, 690 F. Supp. 580, 582 (W.D. Ky. 1988) (citing *In Re DeLorean Motor Co. v. DeLorean*, 755 F.2d 1223, 1228 (6th Cir. 1985)).

### III. DISCUSSION

Veritiv brings eight claims against Phoenix: (1) misappropriation of trade secrets under the Defend Trade Secrets Act, *see* Compl. ¶¶ 94–110; (2) misappropriation of trade secrets under the Kentucky Uniform Trade Secrets Act, *see id.* ¶¶ 111–27; (3) breach of contract, *see id.* ¶¶ 128–37; (4) tortious interference with contracts and a business relationship, *see id.* ¶¶ 138–45; (5) unfair competition, *see id.* ¶¶ 146–48; (6) breach of the implied duty of good faith and fair dealing, *see id.* ¶¶ 149–53; (7) punitive damages, *see id.* ¶¶ 154–55; and (8) injunctive relief, *see id.* ¶ 156–67. Phoenix has also filed a counterclaim against Veritiv, though this counterclaim only seeks damages, not injunctive relief. *See* Answer and Counterclaim, Dkt. 25. As a result, only Veritiv's claims are discussed below.

#### A. Temporary Restraining Order

The Court will analyze the first TRO factor—likelihood of success on the merits—for each of Veritiv's claims, followed by an analysis of the three remaining TRO factors.

##### 1. *Likelihood of Success on the Merits – Trade Secret Claims*

Veritiv asserts claims under both the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836 *et seq.*, and the Kentucky Uniform Trade Secrets Act (KUTSA), Ky. Rev. Stat. § 365.880 *et seq.* *See* Compl. ¶¶ 94–127.

The DTSA and the KUTSA are "nearly identical." *See Allstate Ins. Co. v. Hamm*, No. 2:17-CV-00049 (WOB-CJS), 2020 WL 1431953, at *14 (E.D. Ky. Mar. 23, 2020) (citing *C-Ville Fabricating, Inc. v. Tarter*, No. 5:18-cv-379-KKC, 2019 WL 1368621, at *14 (E.D. Ky. Mar. 26, 2019)). Both laws require a plaintiff to prove that: (1) a trade secret exists and (2) that the trade secret has been misappropriated. *See id.* ("Under both statutes, there must be a trade secret which is misappropriated."). The KUTSA defines "trade secret" to mean "information" that "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." § 365.880(4). And the KUTSA defines "misappropriation" to include the "[d]isclosure or use of a trade secret of another without express or implied consent by a person who" "knew or had reason to know that his knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." *Id.* § 365.880(2). The DTSA defines "trade secret"[2] and "misappropriation"[3] in similar ways. 18 U.S.C.A. § 1839.

The Court therefore treats the federal claim and state claim as having the same legal standards and addresses them together. *Cf. RGIS, LLC v. Gerdes*, 817 F. App'x 158, 162 (6th Cir. 2020).

---

[2] The DTSA defines "trade secret" to mean "all forms and types of . . . information" that "derive[ ] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

[3] The DTSA defines "misappropriation" to include the "disclosure or use of a trade secret of another without express or implied consent by a person who" "at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5).

i. *Identification of Alleged Trade Secrets*

The first question the Court must address is whether Veritiv's allegedly confidential information constitutes a trade secret. Although Veritiv's Complaint defines its trade secrets broadly, this case appears to center on Phoenix telling Three Z details about Veritiv's payment terms with Phoenix. *See* Compl.; *see also* Reply at 3. In effect, Veritiv contends that this disclosure enabled Three Z to calculate Veritiv's profit margins. *See* Compl; *see also* Mot. for TRO and PI. The value of this information lies in the possibility that Veritiv could then be underbid by a competitor, or that Three Z could cut out Veritiv, the middleman, entirely. *See* Compl.; *see also* Mot. for TRO and PI.

To be a trade secret, information must not be *readily ascertainable* by proper means and cannot be *generally known* to other persons. *See* Ky. Rev. Stat. § 365.880(4); *see also ATC Distribution Group, Inc. v. Whatever It Takes Transmissions & Parts, Inc.,* 402 F.3d 700 (6th Cir. 2005). Veritiv runs into a couple of problems here, at least at this stage of the proceedings.

First, it is unclear to the Court whether Three Z could have *readily ascertained* Veritiv's payment terms and profit margin through proper business channels. Three Z knew the product price for Veritiv's paper products because, as the end-customer, Three Z was purchasing those products from Veritiv. And Three Z could have asked Phoenix for the wholesale cost of those products, along with whatever markup Phoenix charged. That information, taken together, would assumedly allow Three Z to calculate Veritiv's payment terms with Phoenix. Neither party discusses whether Three Z could have figured out Veritiv's payment terms using this reverse-engineering method. *See* Mot. for TRO and PI; *see also* Resp. But the possibility that Three Z could have learned Veritiv's payment terms through minimal investigation and deductive reasoning suggests that the information might have been readily ascertainable. This

undermines Veritiv's claim that its payment terms are a trade secret. *See Smart & Assocs., LLC v. Indep. Liquor (NZ) Ltd.*, No. 3:10-CV-614-DJH-DW, 2017 WL 4969354, at *6 (W.D. Ky. Sept. 26, 2017) (noting that "much of the information such as profit margins in the distribution chain was generally known and subject to simple mathematical determination"); *see also Intech Powercore Corp. v. Albert Handtmann Elteka GmbH & Co. KG*, No. CV 14-05508, 2021 WL 1138124, at *8 (D.N.J. Mar. 24, 2021) (same).

Second, the Court is unable to determine, at this time, that a paper distributor's payment terms to one of its manufacturers is not *generally known* within the paper industry. Veritiv argues that its payment terms "are not generally known in the industry." Mot. for TRO and PI at 3; *see also* Second Pfister Aff., Dkt. 19-1, ¶ 4 ("These payment terms are unique between each distributor/supplier. There is no one 'industry standard' that applies to the payment terms between a distributor and its supplier, and each is specifically negotiated."). To support this claim, Veritiv states that it secures this information in password-protected electronic files that are only accessible on a need-to-know basis.[4] *See* Mot. for TRO and PI at 3; *see also* Second Pfister Aff. ¶ 4. Veritiv's precautions tend to show that the information is confidential, but they do not foreclose the possibility (asserted by Phoenix) that a distributor's payment terms are still "well known or easily discovered by those in the industry." Resp. at 1; *see also* Grimm Aff., Dkt. 15-1, ¶ 7 ("Market pricing [for the white paper industry] is well known by customers as well as

---

[4] Phoenix also argues that "Veritiv has not shown that it takes reasonable measure[s] to keep such information secret," but Phoenix does not cite to any authority here. Resp. at 9. In fact, it appears that Veritiv has alleged that it took reasonable measures to protect its payment terms with Phoenix. According to the Complaint, Veritiv "maintain[s] [this information] in a secure computer system in password-protected files;" "Veritiv employees have limited electronic and physical access to [this information,] [which is] available on a need[-]to[-]know basis;" and "vendor[s]/supplier[s] (such as Phoenix) [are required] to maintain Veritiv's confidential information." Compl. ¶¶ 22–23, 38. These allegations likely indicate that Veritiv used reasonable secrecy efforts, at least for the purposes of this motion for temporary restraining order. *See, e.g.*, *Charles Ramsey Co., Inc., v. Fabtech-NY LLC*, No. 1:18-CV-0546 (LEK/CFH), 2020 WL 352614, at *15 (N.D.N.Y. Jan. 21, 2020) (collecting cases). However, Veritiv's internal measures do not necessarily address the Court's concerns that the information still might have been readily ascertainable and generally known.

7

merchant representatives and manufacturers."). For example, closely guarded secrets could still be generally known if they are consistent with widely accepted industry standards. And in fact, another court has noted that "customers and prices in the paper products industry [are] readily available to the manufacturers and [are] not trade secrets." *In re Golden Distributors, Ltd.*, 128 B.R. 352, 362 (Bankr. S.D.N.Y. 1991) (citing approvingly to *Scott Paper Co. v. Finnegan*, 476 N.Y.S.2d 316, 318 (App. Div. 1st Dept. 1984)).

For these reasons, at this stage of the proceedings it seems questionable that Veritiv will succeed on the merits of its trade secrets claims.

Case law does not unmuddy these waters, in large part because the Court is uncertain about the extent to which Veritiv's payment terms were readily ascertainable and generally known. Some cases suggest that Veritiv's payment terms are trade secrets, and others do not. *Compare Greif, Inc. v. MacDonald*, No. CIV.A. 3:06CV312H, 2006 WL 3498050, at *2 (W.D. Ky. Dec. 1, 2006) (finding that pricing information and profit margins, as they relate to a plaintiff's customers, constitute trade secrets, because that information could be valuable to a competitor), *and Juniper Entm't, Inc. v. Calderhead*, No. CV 07-2413, 2007 WL 9723385, at *23 (E.D.N.Y. Aug. 17, 2007) ("Courts have repeatedly held that knowledge of a customer's pricing information in the context of bidding is extremely potent in the hands of a competitor and such knowledge has been held to constitute a trade secret protectable by an injunction."), *with TNS Media Research LLC v. TRA Glob., Inc.,* 977 F. Supp. 2d 281, 315 (S.D.N.Y. 2013) ("Price lists . . . are not, as a matter of law, protected as trade secrets."), *and Silipos, Inc. v. Bickel*, 2006 WL 2265055, at *4 (S.D.N.Y. Aug. 8, 2006) ("[Plaintiff's] discount prices are not trade secrets because they are well known" and because "customers in this narrow industry liberally talk about discounts of the different manufacturers with which they work in order to negotiate the lowest

prices."). And neither party directs the Court to a trade secret case where a manufacturer told a customer about a distributor's payment terms, pricing information, or profit margins *with its manufacturer*.

Ultimately, there is some evidence that Veritiv's payment terms with Phoenix were company trade secrets; but there is also some evidence that these payment terms were not. So although it is *possible* that Veritiv will succeed in proving that its payment terms are a trade secret, that success is not *likely* enough at this stage of the proceedings for the Court to issue a TRO. *See Adams v. City of Marshall*, No. 4:05–cv–62, 2006 WL 2095334 (W.D. Mich., July 27, 2006) ("Both parties have a possibility of success, but that is not enough to satisfy Plaintiffs' obligation to show a substantial likelihood of success.").

ii. *Misappropriation*

The second question the Court must address is whether Phoenix misappropriated the alleged trade secret. Here, Veritiv must demonstrate that Phoenix either obtained the otherwise protected information by improper means or used it without consent. *See Smart & Assocs.*, 226 F. Supp. 3d at 856 (citing *Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F.Supp.2d 784, 795 (W.D. Ky. 2001)).

The parties agree that Phoenix did not acquire Veritiv's purported trade secret by improper means. *See* Mot. for TRO and PI; *see also* Resp. The parties also seem to agree that Phoenix did not have Veritiv's "express or implied consent" to disclose information that it "had reason to know" should have been kept secret. Ky. Rev. Stat. § 365.880(2); *see also* Mot. for TRO and PI; Resp. Phoenix instead presents the Court with three reasons why there is no evidence of misappropriation: first, because Veritiv does not claim that Phoenix disclosed the alleged trade secrets to a competitor; second, because Veritiv fails to explain how it was harmed

9

by the alleged disclosure; and third, because Veritiv's misappropriation claim is based solely on inadmissible hearsay. *See* Resp. at 11.

But none of Phoenix's arguments here respond to the actual misappropriation claim: that Phoenix disclosed Veritiv's trade secret without the latter's consent, despite Phoenix knowing that it owed a duty to maintain the secrecy of that information. *See* Compl. ; *see also* Ky. Stat. Rev.

Accordingly, there is evidence to suggest that misappropriation may have occurred. Nevertheless, because there is insufficient evidence at this stage of the proceedings to show that Veritiv's payment terms to Phoenix were in fact a trade secret, Veritiv's likelihood of success, at this early stage of the proceedings, is not high enough to warrant a TRO.

## 2. *Likelihood of Success on the Merits – Contract Claims*

There are two claims here: one for breach of contract, and another for breach of the covenant of good faith and fair dealing. A party alleging a breach of contract claim must establish three things: (1) existence of a contract; (2) breach of that contract; and (3) damages flowing from the breach of contract.[5] *See KSA Enterprises, Inc. v. Branch Banking & Tr. Co.*, 761 F. App'x 456, 460 (6th Cir. 2019) (citing *Metro Louisville/Jefferson Cty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. Ct. App. 2009)). Similarly, a party can only breach the covenant of good faith and fair dealing if a valid contract exists. *See Am. Gen. Life Ins. Co. v. Harshman*, No. CV 2013-129-WOB-REW, 2015 WL 5474177, at *8 (E.D. Ky. Sept. 17, 2015) (citing *Quadrille*

---

[5] Veritiv and Phoenix both apply Kentucky law to this contract dispute. *See* Mot. for TRO and PI at 16–17; *see also* Resp. at 12–13. However, Veritiv notes that a choice-of-law provision in the Terms and Conditions states that Delaware law applies. *See* Mot. for TRO and PI at 17 n.1. But Veritiv states that it does not matter whether Kentucky or Delaware law applies, because the elements of each states' breach of contract claims are identical. *See id.* The two states do have similar legal standards here. *See H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003) ("Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff."). As such, the Court proceeds under Kentucky law, as the parties do, without making a determination about the choice-of-law provision in the Terms and Conditions.

*Bus. Sys. v. Ky. Cattleman's Assoc.*, 242 S.W.3d 359, 365 (Ky. Ct. App. 2007)). The implied covenant of good faith and fair dealing imposes on the parties a duty to do everything necessary to carry out the contract.[6] *See de Jong v. Leitchfield Deposit Bank*, 254 S.W.3d 817, 823 (Ky. Ct. App. 2007) (quoting *Farmers Bank and Trust Co. v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky. 2005)).

Veritiv maintains that two documents support its claims for breach of contract and breach of the duty of good faith and fair dealing.

Veritiv first refers to its Terms and Conditions, which allegedly were attached to a Purchase Order form that Veritiv used in its dealings with Phoenix. *See* Compl. ¶¶ 34–41; *see also* Purchase Orders, Ex. 5, Dkt. 8-3, at 4. The relevant sections of the Terms and Conditions are: 1 and 16. Section 1 provides:

> **Acceptance; Entire Agreement –** Unless otherwise agreed to in writing, these Terms and Conditions of Purchase ("Terms") apply to all purchases by Veritiv Operating Company ("Buyer") from the supplier of any goods and/or services ("Seller") hereunder. These Terms constitute Buyer's offer and may be accepted by Seller only in accordance with the terms hereof. Seller's acceptance of these Terms and any order hereunder shall occur either through commencement of performance or acknowledgement of the order.

Purchase Orders at 4.

Section 16 states:

> **Confidentiality –** All specifications, data and other information furnished by Buyer, or its agents, to Seller in connection with these Terms or any order hereunder remain the exclusive intellectual property of Buyer and shall be treated by the Seller as proprietary and shall not be disclosed or used, except as necessary to fulfill its obligations hereunder, without prior written approval of Buyer. In addition, the purchase of the Seller's goods does not authorize the Seller to use

---

[6] As discussed *supra* Footnote 5, Veritiv states that the Terms and Conditions contains a choice-of-law provision that applies Delaware law. *See* Mot. for TRO and PI at 17 n.1. Just as they did with the breach of contract claim, the parties apply Kentucky law. *See* Mot. for TRO and PI at 19–20; *see also* Resp. at 12–13. And like the breach of contract claim, the elements of a claim for breach of good faith and fair dealing are the same in Kentucky and Delaware. *See Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010) ("[T]he doctrine requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain.") (quotations and citations omitted).

11

> the name of or make reference to Buyer for any purpose in any releases for public or private dissemination, nor shall the Seller divulge or use in any advertisement or publication any specifications, data or other information pertaining to or relating to this usage without prior written approval of Buyer.

*Id.*

Veritiv next refers to its Supplier Code of Conduct, which it claims is incorporated into the parties' transactions through the Terms and Conditions. *See* Compl. ¶¶ 42–46; *see also* Purchase Orders at 4 (Section 14 of the Terms and Conditions states: "In performance of its obligations to Buyer hereunder, Seller agrees to comply with and require its employees, subcontractors and agents to comply with Buyer's Supplier Code of Conduct."). Veritiv claims that three sections of the Supplier Code of Conduct require confidentiality. *See* Compl. ¶¶ 42–46.

> Veritiv first points to the General Contracting Ethics and Fiscal Integrity provision:

> Suppliers shall meet their contractual obligations. Their representations must be accurate and truthful. They shall keep accurate records that comply with applicable law. Suppliers shall adopt records retention practices required by us, our customers, and the U.S. federal government.

> Supplier Code of Conduct, Dkt. 1-3, at 1.

> Veritiv next cites the Conflicts of Interests provision:

> Suppliers shall disclose any potential conflicts of interest. Such conflicts include without limitation their employees' relationships with our employees and our employees' interest in the supplier's business.

> *Id.* at 1.

> Finally, Veritiv relies on the Intellectual Property and Data Privacy provision:

> Suppliers shall protect our intellectual property rights, trade secrets and proprietary information. Suppliers must protect personally identifiable information from unauthorized disclosure.

> *Id.* at 1.

12

Phoenix makes two arguments in response.  First, Phoenix asserts that there is "[no] enforceable contract because Veritiv has presented no evidence that Phoenix accepted the terms and conditions."  Resp. at 12.  As a result, Phoenix asserts that "there is no ongoing contractual relationship between Veritiv and Phoenix."  *Id.*  Second, Phoenix maintains that even if these documents are binding contracts, "neither document prohibits Phoenix from disclosing payment terms to a customer."  *Id.* at 12–13.

Overall, the excerpted portions of the Terms and Conditions and the Supplier Code of Conduct are very broad.  So broad, in fact, that it is unclear whether either document covers Veritiv's payment terms with Phoenix.  Phoenix states that neither document "describe[s] the manner in which Veritiv expects its suppliers to protect this undefined 'information' and they certainly do not state that a supplier is prohibited from sharing any particular type of information with a mutual customer."  *Id.* at 13.  In its Reply, Veritiv fails to squarely address this point.  *See* Reply at 6–7.

Accordingly, because it is not clear that the Terms and Conditions and the Supplier Code of Conduct prohibited Phoenix from disclosing Veritiv's payment terms, and because there is also a question as to whether the parties even reached a final agreement, the Court cannot conclude at this stage of the litigation that Veritiv is likely to succeed on its contract claims.

3. ***Likelihood of Success on the Merits – Tortious Interference Claim***

Veritiv also makes a claim for tortious interference with a business relationship.  To prevail on such a claim, a plaintiff must prove: (1) existence of a contract; (2) defendant's knowledge of that contract; (3) defendant's intent to cause a breach of that contract; (4) that defendant's actions actually caused a breach; (5) that plaintiff suffered damages as a result of the

breach; and (6) that defendant was not privileged or justified in his conduct.[7] *See Hamm*, 2020 WL 1431953, at *15 (citing *Seeger Enters v. Town & Country Bank & Tr. Co.*, 518 S.W.3d 791, 795 (Ky. Ct. App. 2017)); *see also id.* ("Actual breach of the contract is a 'critical element' of this claim.") (quoting *Ventas, Inc. v. Health Care prop. Inv'rs, Inc.*, 635 F. Supp. 2d 612, 619 (W.D. Ky. 2009). Generally, there must be "malice or some significantly wrongful conduct" to satisfy this claim. *Ibid.*

A claim for tortious interference with a business relationship is often tethered to other claims. To the extent that a tortious interference claim is based entirely upon the allegation that a defendant disclosed trade secrets to a third party, the claim is preempted by the KUTSA. *See Greif, Inc. v. MacDonald*, No. CIVA 3:06CV312 H, 2007 WL 679040, at *2 (W.D. Ky. Mar. 1, 2007). And to the extent that a tortious interference claim is based entirely upon an allegation that a defendant breached a contract's confidentiality requirements, the tortious interference claim can proceed as long as the breach of contract claim moves forward. *See Amtote Int'l, Inc. v. Kentucky Downs*, LLC, No. 1:15-CV-00047-GNS, 2016 WL 1270262, at *6 (W.D. Ky. Mar. 31, 2016).

Here, Veritiv's claim for tortious interference only arises from Phoenix's alleged misappropriation of trade secrets and alleged breach of contract. *See* Compl. So for Veritiv to receive a temporary restraining order based upon its tortious interference claim, either the trade secrets or contracts claims must be likely to succeed on the merits. But the Court has already

---

[7] Again, neither party addresses whether Delaware law should govern the tortious interference claim. *See supra* Footnote 5; *see also* Mot. for TRO and PI at 17–18; Resp. at 13–16. Both parties move forward as though Kentucky law governs this inquiry. *See* Mot. for TRO and PI at 17–18; Resp. at 13–16. Because Delaware and Kentucky apply similar standards here, the Court proceeds (solely for the purposes of this TRO) under Kentucky law. *See Grunstein v. Silva*, No. 3932-VCN, 2009 WL 4698541, at *16 (Del. Ch. Dec. 8, 2009) (Under Delaware law, the elements of a tortious interference with contractual relations claim are "(1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury.").

14

expressed concerns about whether the allegedly confidential information is a trade secret and whether the alleged contracts actually prohibit disclosure of Veritiv's payment terms, *see supra*. Because of those concerns, it does not appear at this time that Veritiv's probability of succeeding on its tortious interference claim is likely enough for the Court to grant a TRO.[8]

4. *Likelihood of Success on the Merits – Unfair Competition Claim*

Veritiv's last claim is for unfair competition. A claim of unfair competition consists of either: (1) injuring the plaintiff by taking his business or impairing his goodwill, or (2) unfairly profiting by the use of the plaintiff's name, or a similar one, in exploiting his goodwill.[9] *See Act for Health v. United Energy Workers Healthcare Corp.*, 784 F. App'x 295, 299 (6th Cir. 2019) (quoting *Covington Inn Corp. v. White Horse Tavern, Inc.*, 445 S.W.2d 135, 139 (Ky. 1969)). A necessary element for either unfair competition theory is "actual or intended deception of the public for business reasons." *Ibid.* For that reason, courts are "overwhelmingly hesitant" to apply unfair competition in situations beyond those "where consumers are deceived by the defendant's efforts to gain from another's business reputation." *See Hamm*, 2020 WL 1431953, at *16 (collecting cases).

---

[8] The parties also go back and forth about whether Phoenix acted with an improper motive, malice, or an intent to deceive. *See* Mot. for TRO and PI at 17–18; Resp. at 14–15; Reply at 7–9. While this is a component of the tortious interference analysis, the Court need not address these arguments at this time. The Court has already decided not to grant a TRO for Veritiv's trade secrets and contracts claims, because Veritiv is not likely enough to succeed on the merits of those claims, *see supra*. That is enough to raise serious questions about the likelihood of Veritiv succeeding on the merits of its tortious interference claim. The issue of Phoenix's motive is better left for a future date, after the Court holds a hearing on this matter, *see infra*.

[9] As with Veritiv's other claims, Delaware law might apply to the unfair competition. *See supra* Footnote 5. And again, Kentucky law and Delaware law are similar in substance. See *Nespresso USA, Inc v. Ethical Coffee Co. SA*, No. CV 16-194-GMS, 2016 WL 11697058, at *1 (D. Del. Sept. 7, 2016) ("To establish the tort of unfair competition under Delaware law, the plaintiff must show that: (1) he had a 'reasonable expectancy of entering a valid business relationship'; (2) the defendant wrongfully interfered with that expected business relationship; and (3) defendant's interference defeated the plaintiff's legitimate expectations, causing him harm.") (quoting *Rypac Packaging Mach. Inc. v. Coakley*, 2000 WL 567895, at *8 (Del. Ch. May 1, 2000)). The parties go by Kentucky law, so the Court will too (at least at this stage of the proceedings).

This case is not the paradigmatic example of unfair competition. The Complaint does not seem to allege that Three Z was deceived by Phoenix's efforts to gain from Veritiv's business reputation. *See id.* So while it is possible that Veritiv might be able to succeed on its unfair competition claim, the Court must be "overwhelmingly hesitant" when evaluating this claim. *See id.* Such a burden is not a good omen Veritiv. Therefore, Veritiv has not demonstrated a strong likelihood of success on the merits for its unfair competition claim.

### 5. *Irreparable Injury*

Veritiv next argues that it would likely suffer irreparable harm without an injunction. An injury is irreparable if the harm is difficult to calculate. *See Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). In the Sixth Circuit, a "competitive injury" is one such irreparable harm. *Id.* at 512. That's because it is difficult to calculate the damages resulting from a competitive injury. *See id.*; *see also Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 279 (6th Cir. 2015) (stating that harm to "goodwill and competitive position . . . would be hard to compensate"). Another irreparable injury is the loss of goodwill. *Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 530 (6th Cir. 2017). "That's especially true in the trade-secrets context, where the offending competitor may mix profits and savings attributable to the misappropriated information—such as those from higher quality products and reduced research costs—with its own natural profits." *RECO Equip., Inc. v. Jeffrey S. Wilson*, No. 20-4312, 2021 WL 5013816, at *4 (6th Cir. Oct. 28, 2021) (citing *Avery Dennison Corp. v. Four Pillars Enter. Co.*, 45 F. App'x 479, 485 (6th Cir. 2002)).

Veritiv alleges injuries for (1) loss of goodwill with its customer Three Z, who Veritiv has other business with; (2) loss of goodwill with Veritiv's other print customers; (3) harm to Veritiv's competitive advantage; and (4) Veritiv's loss of Three Z's business. *See* Mot. for TRO

16

and PI at 22; Reply at 12. These allegations of competitive injury and loss of goodwill are substantiated in the record. For instance, Veritiv claims that Three Z is one of its "most important customers," comprising approximately one third to one half of Veritiv's purchases from Phoenix. *See* First Pfister Aff., Dkt. 9-1, ¶¶ 17–18; *see also* Compl. ¶ 67. Veritiv further states that Three Z was its sixth largest customer for U.S. print sales. *See* Compl. ¶ 66. And in a deposition, Michael Grimm, the current CEO of Phoenix, stated that he told Three Z that he "was not happy with Veritiv," and that "it had to do with trust of . . . how [they] d[id] business together." Grimm Dep., Dkt. 23-1, 53:16-18. As a result, Veritiv maintains that Phoenix moved some of its business from Veritiv to another distributor. *See* Compl.; *see also* Mot. for TRO and PI. These allegations show a "realistic prospect of lost sales and market share," which would harm Veritiv's "goodwill and competitive position in ways that would be hard to compensate." *Collins Inkjet Corp.*, 781 F.3d at 279. Thus, Veritiv's damages would be difficult to calculate, so it has shown a likelihood of irreparable harm.

Phoenix argues to the contrary, stating that the "nature of the injury that Veritiv claims to have suffered—the loss of a customer—is a quintessential example of an economic injury for which Veritiv could be made whole through an award of monetary damages." Resp. at 16. But Phoenix's response does not deal with the allegations of competitive injury and loss of goodwill, which, in the Sixth Circuit, constitute irreparable injury. Accordingly, the Court finds that it is likely that Veritiv has established irreparable harm.

6. **Harm to Others**

The third factor for a court to consider is whether the issuance of the injunction would cause "substantial harm to others." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550–51 (6th Cir. 2007) (quoting *Tumblebus Inc. v. Cranmer*, 399 F.3d 754,

760 (6th Cir. 2005)). Here, courts must balance the irreparable injury that a plaintiff would suffer if its motion for injunctive relief is denied against any harm which would be suffered by others as a result of granting the injunction. *See id.*; *see also Total Quality Logistics, LLC v. Riffe*, No. 1:19-CV-23, 2019 WL 5553293, at *6 (S.D. Ohio Oct. 28, 2019).

Phoenix does not argue that a temporary restraining order would cause any harm to third parties. Rather, Phoenix makes two claims as to why it would be substantially harmed by an injunction. First, Phoenix contends that Veritiv's requested injunctive relief would "forc[e] [Phoenix] to work exclusively with Veritiv as its broker on any particular customer accounts." Resp. at 17. Although Veritiv does not articulate the exact contours of its proposed injunctive relief, the Court reads the Complaint as only asking for a restraint on Phoenix's disclosure of allegedly confidential information. *See* Mot. for TRO and PI. Such an injunction would not mean that Phoenix can only work with Veritiv on particular accounts.

Second, Phoenix argues that it would "suffer substantial harm if it were precluded form using or disclosing whatever undefined 'information' falls within the gambit of Veritiv's claimed 'trade secrets' or 'confidential information.' " *Id.* at 18. However, Phoenix states that at this time it has "no present intention" to switch to a different distributor on any other account. *See* Grimm Aff. ¶ 17. The Court struggles to see how prohibiting Phoenix from doing what it is already refraining from doing would create any type of harm, let alone substantial harm.

Considering the balance of hardships between the parties, the Court finds that this factor currently weighs in favor of Veritiv.

### 7. *Public Interest*

The final factor the Court must evaluate is "whether the public interest would be served by the issuance of the [temporary restraining order]." *Tenke*, 511 F.3d at 551. This case does

18

not appear to implicate any important public policies, other than the general public interests of enforcing contract obligations and fair competition. Such considerations tend to favor Veritiv. But because the Court is unsure about whether Phoenix actually assumed an obligation to keep Veritiv's payment terms a secret, the public interest factor only slightly favors Veritiv.

In balancing the four temporary restraining order factors, especially considering that Veritiv has not demonstrated a strong likelihood of succeeding on the merits, the Court finds that a temporary restraining order against Phoenix is not appropriate. This decision addresses Veritiv's Mot. for TRO and PI, Dkt. 9, and Veritiv's Suppl. Mot., Dkt. 24. The Court reiterates that it has not made a final decision on the merits and its decision with regard to the temporary restraining order does not in any way forecast its decisions in the future.

### B. **Preliminary Injunction**

In its motion for a TRO, Veritiv requests relief in the form of a preliminary injunction asserting the same arguments. *See* Mot. for TRO and PI. Phoenix has responded in opposition to this motion, *see* Resp., and Veritiv has replied, *see* Reply. With this matter fully briefed, both parties have requested a hearing on the motion for preliminary injunction. *See* Order, Dkt. 21. This matter is set for a **telephonic conference** to set a schedule for a **preliminary injunction hearing** on **January 5, 2022 at 11:30am Central Standard Time**. The Court will place the call to counsel. The Court further orders the parties to submit a **proposed scheduling order** on or before **January 3, 2022**.

### C. **Discovery Motion**

On November 22, 2021, Veritiv filed a motion to conduct limited discovery on an expedited basis. *See* Mot. for Disc. Here, Veritiv seeks to take three depositions prior to a hearing on its request for a preliminary injunction. *See id.* at 3. Specifically, Veritiv seeks a

19

deposition of Michael Grimm, the CEO of Phoenix, a deposition of Tom Umenhofer, the sales director of Phoenix, and deposition of a FRCP 30(b)(6) representative of Phoenix. *See id.* In a telephonic conference, both parties agreed to make their witnesses and representatives available to be deposed. In fact, Veritiv has already conducted its deposition of Grimm. *See* Grimm Dep. As such, Veritiv's Mot. for Disc. is denied as moot.

## IV. CONCLUSION

For the above stated reasons, **IT IS HEREBY ORDERED** Veritiv's Mot. for TRO and PI, Dkt. 9, is **DENIED** to the extent that it seeks a TRO, and the Court **SETS A HEARING** on the Mot. for TRO and PI, Dkt. 9, to the extent that it seeks a preliminary injunction. Additionally, Veritiv's Suppl. Mot., Dkt. 24, is **DENIED AS MOOT** and Veritiv's Mot. for Disc., Dkt. 10, is **DENIED AS MOOT**.

**IT IS SO ORDERED**

*[signature: Thomas B. Russell]*

**Thomas B. Russell, Senior Judge**
**United States District Court**

December 20, 2021