IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
PADUCAH

| | |
|---|---|
| VERITIV OPERATING COMPANY, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) Case No. 5:21-cv-170 (TBR) |
| PHOENIX PAPER WICKLIFFE, LLC, | ) |
| | ) |
| *Defendant.* | ) |
| | ) |

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court upon Plaintiff Veritiv Operating Company's Motion for Preliminary Injunction, Mot. for PI, Dkt. 36. Defendant Phoenix Paper Wickliffe, LLC has responded, Resp., Dkt. 40. Veritiv has replied, Reply, Dkt. 41. Each party has also submitted a proposed findings of fact and conclusions of law. *See* Def.'s Prop., Dkt. 60; *see also* Pl.'s Prop., Dkt. 61.

For the reasons that follow, Veritiv's Mot. for PI, Dkt. 36, is **DENIED**.

**I.   FACTUAL BACKGROUND**

The facts of this case are set out in detail in the Court's prior opinion. *See Veritiv Operating Co. v. Phoenix Paper Wickliffe, LLC*, 2021 U.S. Dist. LEXIS 243049 (W.D. Ky. Dec. 20, 2021). Since that opinion, however, further discovery has occurred and a preliminary injunction hearing was held. The Court therefore restates the facts of this case, adding in the new information that is now part of the record.

The plaintiff, Veritiv, describes itself as a merchant for commercial printers and large end-use companies that consume high volumes of paper. *See* Pl.'s Prop. ¶ 5. Veritiv primarily operates as a distributor, purchasing paper from mills and selling that paper to end-use

1

customers. *See id.* ¶ 7. Veritiv provides other services, too. *See id.* ¶¶ 5–6, 9. For example, Veritiv consults and advises its end-use customers about print jobs and manages credit risks for mills. *See id.* One of the mills that Veritiv obtains its paper from, Phoenix, is the defendant in this dispute. *See id.*

The parties began discussing a relationship where Phoenix would sell uncoated white paper to Veritiv, and Veritiv would market and resell that uncoated white paper to its customers. *See* Mot. for PI at 3–4. Phoenix approached Veritiv and asked if Veritiv could become Phoenix's exclusive distributor. *See* Pl.'s Prop. ¶¶ 22–27; Def.'s Prop. ¶ 109. According to Veritiv, the terms of the offer were that if Phoenix could make 40,000–50,000 tons of uncoated paper, Veritiv would purchase that entire volume of uncoated paper from Phoenix's mill. *See ibid.* The parties began negotiating this proposal while Phoenix produced paper for Veritiv to buy. *See ibid.* Veritiv states that sometime during this time period "[t]he first customer [it] brought to Phoenix was Three Z Printing." Pl.'s Prop. ¶ 30. Eventually negotiations over the exclusive relationship broke down because Phoenix hoped to increase its production of uncoated paper to 200,000–240,000 tons, an amount that was too much for Veritiv sell. *See id.* ¶ 33; Def.'s Prop. ¶ 109. So, Veritiv and Phoenix continued their relationship without an exclusivity agreement. *See ibid.*

The parties offer different accounts of what happened next.[1] Veritiv claims that at some point the parties entered into a "Protected Accounts Agreement" because it "was important" to "protect the business" that Veritiv had brought to Phoenix. Pl.'s Prop. ¶¶ 34–35. A Protected Account Agreement means that if a distributor introduces a mill to an end-use customer and the

---

[1] Although both parties provide evidence and make arguments to support their respective positions, these details are better left for later in the opinion, *see infra* Part III.A. The Court believes it is more helpful for the factual background to focus on the parties' general legal theories as opposed to getting bogged down in a slew of emails.

distributor is filling all of that customer's paper needs, then the mill will not sell to that customer directly or through a different merchant. *See id.* ¶¶ 34–38. Veritiv states that it is "general practice in the industry" to protect accounts this way, because otherwise a mill could take advantage of a distributor's sales and marketing efforts. *Id.* ¶¶ 34, 36. Veritiv maintains that the only way for a customer to be removed from the Protected Accounts Agreement is if it chose not to purchase Phoenix paper from Veritiv or if there was a lack of sales. *See id.* ¶ 46. Although there was no executed written contract for the Protect Accounts Agreement, Veritiv states that "it is not common in the industry to have a written Protected Accounts Agreement because the parties are aligned, and each controls the process to the end users." *Id.* ¶ 54.

By contrast, Phoenix maintains that "[t]he parties never entered into an account-specific agreement that limit[ed] Phoenix's right to change merchant representatives or Veritiv's right to change suppliers." Def.'s Prop. ¶ 12. According to Phoenix, "[t]he parties never agreed on any list of 'protected accounts,' much less on any terms that would define what 'protected' meant." *Id.* ¶ 14. This, Phoenix alleges, aligns with the normal industry practice of documenting an account-specific exclusivity agreement in a written contract. *See id.* ¶ 15.

It's against that backdrop that Phoenix met with Three Z and asked to change distributors. *See* Pl.'s Prop. ¶¶ 87–92; Def.'s Prop. ¶¶ 62–63. Phoenix explained that it was hoping to switch distributors because Veritiv had "a very poor payment performance to Phoenix Paper and they were paying [] more than 45 days out." Pl.'s Prop. ¶ 92. Veritiv asserts that it was not late in its payments, explaining that it was paying invoices by mail as Phoenix requested, and the mail system, not Veritiv, was responsible for the late payments. *See id.* ¶¶ 93–95. Without investigating whether Veritiv's payments were in fact late, Three Z asked if it could buy directly from Phoenix. *See* Pl.'s Prop. ¶¶ 96–99; Def.'s Prop. ¶¶ 64–65. Phoenix declined this

3

proposal because it was not in a position to sell directly to customers. *See ibid.* However, Phoenix suggested that Lindenmeyr, another distributor, replace Veritiv as the merchant representative on the account. *See ibid.* Three Z agreed to purchase Phoenix paper from Lindenmeyr. *See ibid.*

Phoenix subsequently informed Veritiv of its intent to change distributors. *See* Pl.'s Prop. ¶ 103; Def.'s Prop. ¶ 67. Phoenix completed all of its outstanding purchase orders with Veritiv and then moved the Three Z account over to Lindenmeyr. *See ibid.*

Veritiv now seeks a preliminary injunction on the basis that Three Z was a protected account and Phoenix's conduct violated the Protected Accounts Agreement.[2] *See* Mot. for PI; *see also* Pl.'s Prop.

## II. LEGAL STANDARD

To determine whether to grant a preliminary injunction, the district court is required to consider four factors: " '(1) the plaintiff['s] likelihood of success on the merits; (2) whether the plaintiff may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of an injunction upon the public interest.' " *Abney v. Amgen, Inc.*, 443 F.3d 540, 546 (6th Cir. 2006) (quoting *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty.*, 274 F.3d 377, 400 (6th Cir. 2001)). "Balancing all four factors is necessary unless fewer are dispositive of the issue." *Katchak v. Glasgow Indep. Sch. Sys.*, 690 F. Supp. 580, 582 (W.D. Ky. 1988) (citing *In Re DeLorean Motor Co. v. DeLorean*, 755 F.2d 1223, 1228 (6th Cir. 1985)).

---

[2] Veritiv brings other claims against Phoenix and Phoenix asserts a counterclaim against Veritiv. *See* Complaint, (Compl.), Dkt. 1, ¶¶ 94–167; Counterclaim, Dkt. 25. However, Veritiv only seeks a preliminary injunction on the basis of Phoenix's alleged breach of the Protected Accounts Agreement. *See* Mot. for PI.

4

### III. DISCUSSION

#### A. Likelihood of Success on the Merits

The first factor to consider is whether Veritiv is likely to succeed in its breach of contract claim. A party alleging a breach of contract claim must establish three things: (1) existence of a contract; (2) breach of that contract; and (3) damages flowing from the breach of contract. *See KSA Enterprises, Inc. v. Branch Banking & Tr. Co.*, 761 F. App'x 456, 460 (6th Cir. 2019) (citing *Metro Louisville/Jefferson Cty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. Ct. App. 2009)).

The analysis here turns on whether a contract existed. Veritiv focuses on nine pieces of evidence that it claims memorialize the material terms of the Protected Accounts Agreement and show that Phoenix agreed to those terms.

*One.* In a July 23, 2020, email, James Devens, a Phoenix sales representative, communicated to Ken Flajs, Regional Print Leader for Veritiv, that Veritiv was "still [Phoenix's] horse in this process to fill [Phoenix's] machine. Phoenix is of course protecting current Veritiv position and hoping to grow significantly with Veritiv." Pl.'s Ex. 22.

*Two.* Veritiv emailed a list of protected accounts to Phoenix on July 29, 2020. *See* Pl.'s Ex. 42; *see also* Pl.'s Prop. ¶ 131.

*Three.* In an August 2020 email chain with the subject "Phoenix Paper Protected Accounts," Veritiv confronted Phoenix about an issue with one of its customers, *The Tampa Bay Times*. Jeff Pfister, Director of Category Management and Strategy for Veritiv, told Tom Umenhofer, Phoenix's Sales Director, that "this is another scenario where we were undercut on your product by one of your new distributors at one of your protected accounts. We are losing faith in our partnership as we are seeing lower pricing from other distributors at our protected accounts." Pl.'s Ex. 44; *see also* Transcript at 194. On that same email chain, John Hirsch, a

5

Veritiv employee, said to Steve Moreau, Phoenix's former head of sales and marketing, "[i]f you are the partner you claim you are you will correct your mistake and no quote the other vender." Pl.'s Ex. 44.

*Four.* On September 9, 2020, Umenhofer emailed Veritiv saying "[w]e will continue to support only Veritiv at IBS and Diamond Graphics as long as the accounts continue to be active by using Phoenix Paper." Pl.'s Ex. 23. IBS and Dimond Graphics are two printers who purchased Phoenix paper through Veritiv. Transcript at 161.

*Five.* On October 16, 2020, Dave Carlson, a Veritiv employee, emailed Brian Sagula, a sales representative for Phoenix, asking for a list of protected accounts. *See* Pl.'s Ex. 24. Sagula responded with a list of seven accounts, adding that "[a]s Veritiv brings us new accounts, we will also consider." *Id.*

*Six.* On November 3, 2020, Sagula received a request from a distributor wanting Phoenix to quote a paper order for Three Z. Pl.'s Prop. ¶ 131. Sagula responded that Phoenix has "this account covered and unfortunately I have to no quote [Three Z] in Ill." *Id.* The distributor then asked Sagula to quote two other customers, which Sagula declined to do because Phoenix had those accounts "covered." *Id.*

*Seven.* In a November 9, 2020, email, Sagula asked Umenhofer if there was "any issue quoting [another distributor] for [an] opportunity." Pl.'s Ex. 29. Umenhofer responded that Sagula should check with Jim Devens, who in turn stated that "we are protecting Veritiv and have already told [the customer and distributor] the account is protected through Veritiv." *Id.* Sagula replied that he would "no quote this one." *Id.*

*Eight.* On November 10, 2020, Devens contacted Veritiv requesting a copy of "a Veritiv/Phoenix protected account list." Pl.'s Ex. 26.

6

*Nine.* In response to a Phoenix employee's request for "the Veritiv protected list," Devens sent a November 19, 2020, email to the entire Phoenix sales team containing a list of protected accounts. Pl.'s Ex. 28. Devens stated that "this is the wish list" from Veritiv, but "if others are wanting to quote let's double check to assure we don't already have established sales and business at an account." *Id.* That same day Umenhofer emailed the Phoenix sales team to say that "[i]f we do not have ongoing business through Veritiv at any of [those] accounts . . . , the accounts are not 'protected.' " *Id.*

So, is that enough for Veritiv to prove that an enforceable contract existed? To answer that question, Veritiv begins by invoking the Uniform Commercial Code. *See* Resp. at 15–16. Veritiv asserts that the UCC applies here because the parties entered into a distributorship agreement primarily related to the sale of paper. *See id.* at 15. According to Veritiv, this means that "the 'writing' requirement" is "loosely interpret[ed]" and its only burden is to show (1) evidence of a contract for the sale of goods (2) that is signed and (3) specifies a quantity. *Id.* at 16 (quoting *Commonwealth Aluminum Corp. v. Stanley Metal Ass'n*, 186 F. Supp. 2d 770, 772 (W.D. Ky. 2001)).

However, even assuming for the sake of argument that the UCC applies, Veritiv's writing requirements argument still runs into a problem. The "loos[er]" writing requirements cited by Veritiv don't just apply to any UCC contract, they only apply to the enforcement of oral contracts. *Stanley Metal Ass'n*, 186 F. Supp. 2d at 772. But it is not clear at this stage of the proceedings that the Protected Accounts Agreement is an oral contract, or, if it is an oral contract, when exactly Veritiv and Phoenix entered into that contract.

It's possible that, as Phoenix argues, the Protected Accounts Agreement should be viewed as an implied contract. Under Kentucky law, "[a]n implied contract is one neither oral

7

nor written—but rather, implied in fact, based on the parties' actions." *Delamar v. Mogan*, No. 4:13CV-00047-JHM, 2015 WL 225404, at *5 n.3 (W.D. Ky. Jan. 15, 2015) (quoting *Furtula v. Univ. of Kentucky*, 438 S.W.3d 303, 308 n.6 (Ky. 2014)). Veritiv claims that it is "general practice" in the paper industry to protect accounts because a paper mill wouldn't "go and offer [its] product" to another distributor only to "undercut the very [distributor] who trusted [it] up front." Mot. for PI at 6 (quoting Moreau Dep., Dkt. 36-4, at 86–87). Indeed, Pfister stated at the preliminary injunction hearing that protected accounts are so "standard" and "common" in the paper industry that Veritiv "didn't feel like [it] needed to memorialize the protected accounts." Transcript at 70. If that's the case, then wouldn't Three Z have become a protected account immediately upon Veritiv bringing that business to Phoenix? Phoenix argues this point, claiming that the Court should view the Protected Accounts Agreement as an alleged implied contract. *See* Resp. at 13. Phoenix further asserts that because the alleged contract is implied, Veritiv is not subject to the UCC's more lenient writing requirements and instead has to show "clear and convincing" evidence of an ongoing contractual relationship. *Id.* at 13 (citing *BDT Prod., Inc. v. Lexmark Int'l, Inc.*, 274 F. Supp. 2d 880, 888 (E.D. Ky. 2003)). Veritiv's failure to respond to any of these arguments or to provide communications evidencing an oral agreement does not portend success for this UCC argument. *See* Reply; *see also* Pl.'s Prop.

Furthermore, even assuming that the Protected Accounts Agreement is not an implied contract, Veritiv's allegations do not make clear when exactly the parties entered into an oral contract. Veritiv alleges that in "late February 2020" Phoenix agreed that "if there were accounts sold through Veritiv, then Phoenix would not sell it through anyone else." Mot. for PI at 5 (internal quotations and citation omitted). However, Veritiv also asserts that "in spring 2020" the parties "shifted their agreement to the Protected Accounts Agreement." *Id.* Confusing things

8

even more, Veritiv also claims that "[i]n June 2020" the decision "to forgo the exclusive relationship in favor of the Protected Accounts Agreement had been reached" and a list of protected accounts was provided to Phoenix. *Id.* at 6–7. This uncertainty about when exactly Phoenix might have orally agreed to the Protected Accounts Agreement adds to the Court's reluctance to apply UCC law regarding the enforcement of oral contracts.

Therefore, for the purposes of the preliminary injunction analysis, the Court puts little weight on Veritiv's UCC writing requirement argument.[3] The Court next addresses the purported terms of the contract.

"An enforceable contract must contain definite and certain terms setting forth promises of performance to be rendered by each party." *C.A.F. & Assocs., LLC v. Portage, Inc.*, 913 F. Supp. 2d 333, 343 (W.D. Ky. 2012) (quoting *Kovacs v. Freeman*, 957 S.W.2d 251, 254 (Ky. 1997)). While every possible term need not be defined, the agreement must set forth the "essential terms" of the deal. *Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F. Supp. 2d 784, 790 (W.D. Ky. 2001).

Veritiv has not shown that the Protected Accounts Agreement contained definite and certain terms regarding when exactly an account became protected. Pfister testified at the preliminary injunction hearing that he assembled Veritiv's list of proposed protected accounts by "identif[ying] the basket of products that Phoenix Paper manufactures . . . and identif[ying] the customers of Veritiv that had bought those products from Veritiv and then par[ing] that list down to where Phoenix Paper was 70 percent or more of sales to those customers of those like products." Transcript at 65. Veritiv's request for preliminary injunction turns on this 70 percent

---

[3] Veritiv could succeed in proving that the Protected Accounts Agreement is an oral contract governed by the UCC and therefore subject to looser statute of frauds requirements. But the Court cannot adopt that reasoning at this stage of the proceedings because Veritiv has not demonstrated a strong enough chance of succeeding on the merits of that argument.

9

term; after all, that's the cutoff point Veritiv uses to determine whether an account should be covered by a preliminary injunction. But none of the evidence that Veritiv relies upon mentions this 70 percent term. Veritiv's pleadings are similarly silent about this term. And at no point does Veritiv explain why it uses this 70 percent figure: Why not 80 percent? Or 50 percent? Or 73 percent? Issuing a preliminary injunction on the basis of this 70 percent term (or any other seemingly arbitrary cutoff point) would therefore be inappropriate, especially when Phoenix contends that Veritiv's allegations do not evidence any meeting of the minds on essential terms. *See* Resp. at 14. In the future Veritiv might well succeed in proving that the Protected Accounts Agreement protected an account when 70 percent of Veritiv's sales volume for that account came from Phoenix. But at this time Veritiv has not shown that it is likely to succeed on this point.

In that same vein, Veritiv asks the Court to enter a preliminary injunction covering not only Three Z but also covering 44 other Phoenix accounts. *See* Proposed Order, Dkt. 36-1. But Veritiv has not provided specific evidence about how the terms of the Protected Accounts Agreement apply to each one of these accounts. Nor has Veritiv demonstrated that it would constitute a breach of contract if Phoenix decided to use a different distributor on each individual account. Nor has Veritiv shown that this list of 45 accounts existed prior to this litigation. The Court cannot determine based on this record whether or not each of the 45 accounts listed in the proposed preliminary injunction order should be enjoined.

That said, Phoenix's explanation of the terms of the agreement also leaves the Court with questions. At the preliminary injunction hearing, Phoenix representatives testified that their communications with Veritiv about protected accounts related only to pricing. By this, Phoenix means that it agreed that it wouldn't quote another distributor at a lower price for the same

product, thereby protecting Veritiv price-wise based on its volume of sales. *See* Transcript at 262. This might not be the whole story, though, because as Veritiv points out, email communications show instances where Phoenix honored the protected account agreement even though it had never quoted a price or discussed pricing. *See* Pl.'s Ex. 29. Furthermore, Umenhofer stated that Phoenix's general practice is to quote different distributors at the same prices. Transcript at 185–86. It would be strange, then, for Phoenix to enter into an agreement with Veritiv to protect accounts in the same way that Phoenix was already protecting every other account.

While Phoenix's description of the Protected Accounts Agreement presents some problems, that does not necessarily mean that an enforceable contract existed between the parties. Questions still remain as to the terms of the Protected Accounts Agreement and which accounts would be covered by a preliminary injunction. Veritiv may succeed on the merits of its claim, but the Court is unable to conclude at this time that Veritiv's chances of doing so are strong.[4]

### B. Irreparable Harm

Veritiv next argues that it would likely suffer irreparable harm without an injunction. An injury is irreparable if the nature of the plaintiff's loss would make damages difficult to calculate; an injury is not irreparable if it is fully compensable by money damages. *See Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). On the one hand, Veritiv alleges the following harms: (1) customer relationship interference; (2) loss of fair competition;

---

[4] The parties also dispute whether Devens had adequate authority to bind Phoenix and whether the Protected Accounts Agreement fails for lack of consideration. *See* Resp. at 14–16; Reply at 5, 8–10. However, these issues are of secondary importance to the actual terms of the Protected Accounts Agreement. And because the contract's terms do not show that Veritiv has a strong likelihood of success on the merits, the Court need not address questions of Devens' authority and consideration at this time.

(3) harm to Veritiv's goodwill; and (4) loss of business opportunities. *See* Mot. for PI at 19–20. On the other hand, Phoenix argues that "[t]he nature of the injury Veritiv claims to have suffered—loss of monetary revenue resulting from an alleged breach of contract—is a quintessential example of an economic injury for which Veritiv could be made whole through an award of monetary damages." Resp. at 23 (citing *Hogan v. Long*, 922 S.W.2d 368 (Ky. 1995)).

In the Sixth Circuit, a "competitive injury" is an irreparable harm. *Basicomputer Corp.*, 973 F.2d at 512. That's because it is difficult to calculate the damages resulting from a competitive injury. *See id.*; *see also Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 279 (6th Cir. 2015) (stating that harm to "goodwill and competitive position . . . would be hard to compensate"). For example, in *Am. Home Shield Corp. v. Ozur*, No. 16-CV-2400-SHL-TMP, 2016 WL 8738243 (W.D. Tenn. Sept. 13, 2016), a plaintiff alleged that a defendant was soliciting a number of its clients and employees, and encouraging them to leave the plaintiff for its competitor. *See id.* at *5. And because the plaintiff in *Am. Home Shield Corp.* presented evidence that its business was suffering significantly from this solicitation, the court found that the plaintiff would suffer irreparable harm in the absence of a preliminary injunction. *See id.*

Like the plaintiff in *Am. Home Shield Corp.*, Veritiv alleges that Phoenix is encouraging customers to leave Veritiv for one of its competitors. This happened with Three Z, one of Veritiv's largest customers. Transcript at 111. And because the paper market is so "tight" right now, Veritiv does not have the option of selling another supplier's paper to Three Z. *Id.* at 117, 144. So instead of selling paper to Three Z and growing its business, Veritiv is having to focus its efforts and expenses on combatting the alleged unfair competition created by Phoenix. *See Am. Home Shield Corp. v. Specter*, No. 2:19-CV-2184-MSN-DKV, 2019 WL 4935459, at *6 (W.D. Tenn. Apr. 25, 2019). These allegations show a "realistic prospect of lost sales and

market share," which would harm Veritiv's "goodwill and competitive position in ways that would be hard to compensate." *Collins Inkjet Corp.*, 781 F.3d at 279. Thus, some of Veritiv's damages would be difficult to calculate, meaning that Veritiv has shown a likelihood of irreparable harm.

### C. **Substantial Harm to Others**

The third factor for a court to consider is whether the issuance of the injunction would cause "substantial harm to others." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550–51 (6th Cir. 2007) (quoting *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005)). Here, a court must balance the irreparable injury that a plaintiff would suffer if its motion for injunctive relief is denied against any harm which would be suffered by others as a result of granting the injunction. *See id.*; *see also Total Quality Logistics, LLC v. Riffe*, No. 1:19-CV-23, 2019 WL 5553293, at *6 (S.D. Ohio Oct. 28, 2019).

Phoenix does not argue that a temporary restraining order would cause any harm to third parties. Rather, Phoenix contends that Veritiv's requested injunctive relief would "severely hinder Phoenix's ability to compete in the marketplace by forcing the [] mill to remain in an economically disadvantageous relationship with Veritiv while competing paper mills are free to work with merchant representatives of their choice." Resp. at 24. To the extent that Phoenix might have breached the Protected Accounts Agreement, "that harm is self-inflicted" and Phoenix "may not benefit from [its] breach of contract." *Handel's Enterprises, Inc. v. Schulenburg*, No. 4:18-CV-00508, 2020 WL 419158, at *10 (N.D. Ohio Jan. 27, 2020); *Dealer Specialties, Inc. v. Car Data 24/7, Inc.*, No. 1:15-cv-170, 2016 WL 5341797, at *8 (S.D. Ohio Sept. 23, 2016). However, the Court is uncertain that Veritiv will succeed on its breach of contract claim, *see supra*, so the harm here is not necessarily self-inflicted.

13

D.  **Public Interest**

The final factor for a court to evaluate is "whether the public interest would be served by the issuance of the injunction." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 551 (6th Cir. 2007) (quoting *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005)). This case does not appear to implicate any important public policies other than the general public interest of enforcing contract obligations. This consideration tends to favor Veritiv. *See Tenke Corp.*, 511 F.3d at 551 ("Enforcement of contractual duties is in the public interest."). But the public interest is diminished by the fact that the Court is unsure about whether Phoenix actually entered into a Protected Accounts Agreement with Veritiv, *see supra*.

In balancing the four temporary restraining order factors, especially considering Veritiv's likelihood of succeeding on the merits, the Court finds that a preliminary injunction against Phoenix is not appropriate.

IV.  **CONCLUSION**

For the above stated reasons, **IT IS HEREBY ORDERED** Veritiv's Mot. for PI, Dkt. 36, is **DENIED**. A **telephonic status conference** will be held on **July 25, 2022 at 9:30 with Magistrate Judge Lanny King.** Counsel for the parties shall connect to the call by dialing the toll-free meeting number 1-877-848-7030 and entering access code 7238577# when prompted.

**IT IS SO ORDERED.**

Thomas B. Russell, Senior Judge
United States District Court

July 1, 2022

cc: Counsel

14