## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## PADUCAH DIVISION

VERITIV OPERATING COMPANY                                      PLAINTIFF

v.                                                            No. 5:21-cv-170-BJB

PHOENIX PAPER WICKLIFFE, LLC                                   DEFENDANT

**\* \* \* \* \***

### POST-TRIAL ORDER DENYING MOTION FOR JUDGMENT AS A MATTER OF LAW AND FOR A NEW TRIAL, DENYING IN PART REMITTITUR MOTION, AND DENYING WITHOUT PREJUDICE REQUEST FOR ATTORNEY'S FEES

Veritiv, a national distributor of paper, sued its former supplier, the Phoenix paper mill, for breach of a "protected accounts" agreement after Phoenix and a major customer decamped for a rival distributor. Although Phoenix won summary judgment on Veritiv's claim that it breached a so-called "protected accounts" agreement, Veritiv's claims for tortious interference, trade-secrets misappropriation, and breach of a confidentiality provision went to trial. So did Phoenix's counterclaim that Veritiv breached their contract by taking unearned prompt-pay discounts.

After six days of testimony, the jury sided with Veritiv on all claims and awarded it $10 million in economic and punitive damages. Afterwards, Phoenix sought judgment notwithstanding the verdict under Rule 50(b), a new trial under Rule 59(a), and remittitur of the damages award under Rule 59(e). The parties agree that $400,000 in damages was erroneously double-counted, and Veritiv concedes that its attorney-fees request is incorrect in part. Otherwise, given the highly deferential standard reviewing courts afford jury verdicts, and the extensive-if-not-irrefutable record laid before the jury, the Court declines to disturb its verdicts or damages determinations. So the Court denies Phoenix's motions for judgment and a new trial, grants in part and denies in part its remittitur request, and denies without prejudice its attorney-fee request.

### I.    Standard of Review

Rule 50(a)(1) provides that a court may award judgment as a matter of law, notwithstanding a jury's contrary verdict, with respect to any claim or defense for which "a reasonable jury would not have a legally sufficient basis to find for the party on that issue." FED. R. CIV. P. 50(a)(1). Judgment as a matter of law is a remedy to be "granted cautiously and sparingly by a trial judge." 9B C. WRIGHT & A. MILLER,

FEDERAL PRACTICE AND PROCEDURE § 2524 (3d ed.).  It's appropriate only if, "viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party." *Tisdale v. Federal Exp. Corp.*, 415 F.3d 516, 527 (6th Cir. 2005).[1]

Rule 59(a) similarly authorizes a trial judge to grant a motion for a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  FED. R. CIV. P. 59(a).  Precedent has whittled this standard down to only a few limited circumstances: when a verdict leads to "seriously erroneously result" or is "against the weight of evidence," damages are excessive, or some unfairness tainted the trial.  *Holmes v. City of Massillon*, 78 F.3d 1041, 1046 (6th Cir. 1996).  Although the new-trial inquiry permits a court to (in some sense) weigh the evidence, "granting a new trial on this ground is a rare occurrence," and a verdict should be upheld "if it was one which the jury reasonably could have reached." *Armisted v. State Farm Mut. Auto Ins. Co.*, 675 F.3d 989, 995 (6th Cir. 2012).  *See*

---

[1] Phoenix argues that, at least for the state-law claims, the forum state's standard for judgment as a matter of law governs rather than the federal standard under Rule 50.  Motion at 3–4.  And at least some Sixth Circuit precedent supports that argument.  *See K&T Enterprises v. Zurich Ins. Co.*, 97 F.3d 171, 176 (6th Cir. 1996) ("[W]hen sitting in diversity, we review denial of a Rule 50 motion using the same standards applicable under the law of the forum state.") (quotation marks omitted).  This circuit precedent traces that rule to the Supreme Court's decision in *Erie R.R. Co. v. Thompkins*, 304 U.S. 64 (1938), which held that because there is no federal general common law, state substantive law must govern diversity cases in federal court.  (The same rule applies when, as here, a federal court hears state-law claims under its supplemental jurisdiction.  *See Super Sulky v. U.S. Trotting Ass'n*, 174 F.3d 733, 741 (6th Cir. 1999).)  Yet more recent Supreme Court decisions have made clear that "when a Federal Rule of Civil Procedure is on point, a federal court bypasses *Erie*'s inquiry altogether." *Berk v. Choy*, 146 S.Ct. 546, 552 (2026).  "[A] valid rule of civil procedure" thus "displaces contrary state law even if the state law would qualify as substantive under *Erie*'s test." *Id.*

Here, to the extent Rule 50 supplies a standard to decide motions for judgment as a matter of law for federal questions—as Sixth Circuit precedent makes clear that it does, *see K&T Enterprises*, 97 F.3d at 176—that same standard would seem to apply to state-law questions too.  *See* 9B WRIGHT & MILLER § 2525 ("[P]rinciple seems to require that the federal court apply the federal test.").  In any event, Kentucky law seems to pose the same basic inquiry: "whether there is a complete absence of proof on a material issue in the action, or if no disputed issue of fact exists upon which reasonable minds could differ." *Estate of Riddle ex rel. Riddle v. Southern Farm Bureau Life Ins. Co.*, 421 F.3d 400, 408 (6th Cir. 2005) (citation omitted).  So nothing of consequence turns on which formulation the Court applies here.

*also* 11 WRIGHT & MILLER § 2806 ("[I]n most cases the judge should accept the findings of the jury, regardless of the judge's own doubts in the matter.").

Phoenix challenges each of the jury's liability determinations under both standards—and for similar reasons. In such circumstances, post-trial reasoning often overlaps. That is, many of the same reasons that defeat a new-trial request may likewise imply why a so-called JNOV motion also fails—and vice versa. *See, e.g.*, *Max Rack, Inc. v. Core Health & Fitness, Inc.*, 40 F.4th 454, 470 (6th Cir. 2022) ("Although Rule 59's weight-of-the-evidence standard differs from Rule 50's sufficiency-of-the-evidence standard, we reach this result based on the same evidence and reasoning on which we relied when affirming the denial of judgment as a matter of law."). In other words, even if a losing party's post-trial objection to the *weight* of the evidence under Rule 59 might conceptually justify a new trial in circumstances that wouldn't support a judgment notwithstanding the verdict under Rule 50 based on the *sufficiency* of the evidence, such instances surely prove the exception. That's the case here: under either standard, Phoenix's challenges to the jury determinations fail.

## II.     Proof at Trial

Based on jury instructions the parties don't challenge here, Phoenix set out to prove three claims:

1. *Tortious interference with prospective business advantage.* This tort required (as elaborated at greater length in the jury instructions, *see* DN 201) that Veritiv had a valid business relationship or expectancy for the ongoing purchase of paper by Three Z (its principal customer), which Phoenix was aware of when it improperly and intentionally interfered with in a manner that damaged Veritiv by preventing it from continuing the relationship.[2]

---

[2] Veritiv's theory of tortious interference involved the same overall scheme that underpinned its theory of misappropriation of trade secrets. Phoenix argued that these similarities meant that the federal and state trade-secrets statutes preempted the tortious-interference claim. *See* Trial Brief (DN 160) at 6–7. At trial, the Court held that "to the extent Veritiv's tortious interference claim rests on Phoenix's allegedly improper or wrongful disclosure, misappropriation of Veritiv's purported trade secrets—specifically to pricing, payment terms, payment history—that is preempted by the [Kentucky Trade Secrets Act]." Trial Vol. 4-A at 4. So, to prove its tortious-interference claim, Veritiv focused instead on Phoenix executives' allegations to Three Z of slow payments that had fed Phoenix's distrust of Veritiv. That distinction provides the sort of "further factual basis" that permits a related tort to escape preemption. *See Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F. Supp. 2d 784, 789 (W.D. Ky. 2001).

2. *Misappropriation of trade secrets.* Under the federal Defend Trade Secrets Act and the Kentucky Uniform Trade Secrets Act, Veritiv could recover if it proved that Veritiv possessed trade secrets in the form of its payment terms, pricing terms, and sales history with Phoenix and Three Z; that Phoenix acquired the trade secret through a confidential relationship or under a duty not to disclose it; and that Phoenix used or disclosed the trade secret without permission in a manner that benefited Phoenix or harmed Veritiv.

3. *Breach of contract.* Veritiv had to prove that each Purchase Order and Invoice with Phoenix was a contract that Phoenix breached in a manner that harmed Veritiv when it breached confidentiality obligations regarding payment terms, pricing terms, and sales history.

Viewing the proof at trial in the light most favorable to Veritiv, as the law requires, Veritiv presented a story in which Phoenix orchestrated a plan to convince Three Z to buy Phoenix's paper from Veritiv's competitor Lindenmeyr instead of from Three Z—all so Phoenix could raise its prices.

The story begins shortly before the pandemic, when Phoenix set out to revive the shuttered Wickliffe (Ky.) paper mill and needed a customer base, distribution network, and sales expertise. *See* Trial Vol. 3 (DN 213) at 9 (Devens). So Phoenix agreed to work with Veritiv, an established national paper distributor with a roster of clients and network of salespeople who bought and sold lots of paper. Because Phoenix, as an upstart, lacked leverage and relied on Veritiv to perform many core sales functions, Phoenix agreed to give Veritiv quite favorable payment terms—namely, 45 days to pay its invoices, with a one-percent discount if it did.

Perhaps Veritiv's most important function was introducing Phoenix to Three Z, a national client—which purchased up to "one hundred [semi-]truckloads of paper a month." Trial Vol. 1 (DN 206) at 149. Before that introduction, "Phoenix had no knowledge of Three Z Printing, and … Three Z Printing had no knowledge of Phoenix without Veritiv." Trial Vol. 1 at 153. From there, the partnership flourished. As one witness put it, Phoenix and Veritiv were "all working together on a common good." Trial Vol. 1 at 154. Three Z was an "important customer" for the Veritiv-Phoenix partnership. Volume 3 (DN 213) at 21–23. So Three Z received favorable pricing when buying through Veritiv, which Veritiv and Phoenix "jointly" memorialized in a February 2021 agreement with Three Z. Trial Vol. 3 at 11:21–12:22; Joint Exhibit 2 (DN 221-10). If the market improved, this agreement insulated Three Z from substantial price increases, though it limited Phoenix's upside.

4

Two years into the partnership, however, the relationship changed.  Phoenix decided that it was losing too much money and needed to increase its profitability— a task made much harder because of the pricing constraints imposed by Veritiv.

But Mike Grimm had a plan.  He joined Phoenix as CEO in September 2021. Trial Vol. 2-B (DN 207) at 42:6–15; Defendant's Exhibit 2.  By October 2021, paper prices had risen across the industry.  Trial Vol. 3 at 15 (Devens).  But Phoenix's price commitment boxed it out.  *See* Joint Exhibit (DN 221-10 at 4).  So Phoenix reached out to Lindenmeyr, a competitor of Veritiv, through Peter Harding, Lindenmeyr's head of commercial print.  *See* Trial Vol. 2-B at 39:1–12.  Without Veritiv's knowledge, Phoenix's Grimm and Lindenmeyr's Harding began emailing about the possibility of Lindenmeyr obtaining Three Z's business.  Trial Vol. 2-B at 59–60.  But what was Three Z's incentive to switch suppliers and pay more for Phoenix's paper?  Three Z was a satisfied customer of Phoenix's paper, but Phoenix was losing money. Defendant's Exhibit 3 (DN 231-4).  At one point Phoenix considered explaining to Three Z how the status quo disserved both sides' interests in a long-term partnership. An email exchange with Lindenmeyr set out the option simply to tell Three Z that "Veritiv was selling below the market[,] which long ter[m] does not help 3Z or the mill."  Grimm responded that "[t]he plan looks good."  Defendant's Exhibit 3 (DN 231-4).

But instead of approaching the economic issues directly with Three Z or Lindenmeyr, Phoenix took a different—that is, a less transparent and upstanding— approach.  It set out to convince Three Z that Veritiv was an unreliable business partner—whose frequently late payments threatened Three Z's ongoing relationship with Phoenix.

To that end, Phoenix decided to unearth some past-due invoices and complain about them.  Tom Umenhofer, Phoenix's sales director, in September 2021, alerted Veritiv that several payments were delinquent.  This was the first time Phoenix had emailed Veritiv about payment-timing concerns.  *See* Defendant's Exhibit 1 (DN 221-12).  Veritiv's Jeff Pfister, who received the emailed complaint from Umenhofer, testified that he immediately forwarded the email to accounting, which reported that most of the past-due Phoenix invoices had already been paid.  Trial Vol. 2-B at 6–7; Defendant's Exhibit 1 (DN 221-12).  Then Veritiv again tried to problem-solve: it requested that Phoenix switch to ACH payments to avoid any potential delays or misunderstandings in the future.  Umenhofer responded in agreement, but never said or did anything more about these alleged late payments.  Neither did anyone else from Phoenix.  *See id.*

Problem solved?  Unfortunately not.  Phoenix continued emailing with Lindenmeyr, though not to complain about any late payments by Veritiv.  *See* Trial

Vol. 4-B (DN 215) at 12. Instead, they planned a meeting with Three Z—apparently to discuss, among other things, Phoenix's "cost pressure" and "market" conditions, which together suggested Three Z should switch distributors. *See* Defendant's Exhibit 3 (DN 231-4); Trial Vol. 4-B at 12. But that's not the story that Grimm told Three Z when he met with their executives in October 2021: he reported that Veritiv was a "slow payer" who was always "paying late"—"excessively" late, even. Trial Vol. 2-B at 99. Overall, Veritiv had "very poor payment performance." *Id.* at 50. These patterns called Phoenix's "trust" into question. *Id.* at 120.

This matched the evidence the jury heard (indirectly) from or about Three Z— that it transitioned its Phoenix business away to Lindenmeyr and away from Veritiv because it thought "Veritiv was slow paying." Trial Record Stipulation (DN 210-1) at 11–12.[3] Three Z finished its contract with Veritiv, and then bought Phoenix paper exclusively from Lindenmeyr, which it perceived to be Phoenix's preferred supplier. Trial Vol. 3at 26 (Devens). Because of this shift, Veritiv lost business—both directly in the lost volume from a key client of two decades (Three Z) as well as indirectly in the loss of trade secrets leaked to a competitor (Lindenmeyr). *See id.*at 57.

The latter harm came from the disclosure of protected information in the form of trade secrets regarding Veritiv's payment terms, order histories, and pricing. To recruit Lindenmeyr to its cause and persuade Three Z to shift its business, Phoenix leaked pricing and payment details to Lindenmeyr and Three Z so Lindenmeyr could put together a more attractive pricing package that would increase Phoenix's profitability as it ditched Veritiv and its long-term low-price guarantee. Phoenix also leaked Veritiv's order history to Lindenmeyr so that Lindenmeyr could take over those orders. (This effort failed.)

Just how important were these payment terms, pricing information, and order histories? Veritiv's senior vice president, Daniel Watkoske,[4] testified that the company derives economic value from the confidentiality of this information. *See* Trial Vol. 3 at 56. A comprehensive sales "program," explained Watkoske, includes purchase orders, pricing, rebates, and payment terms. *Id.* at 57. Several industry veterans testified that they'd never shared or received this information. *See, e.g.,* Trial Vol. 2-B at 50 (Grimm); Trial Record Stipulation (DN 210-1) at 5 (Jansen). Grimm agreed that in his 22 years working in the paper industry he had never shared a distributor's payment terms with an end customer. Trial Vol. 2-B at 50:20–25. And

---

[3] The parties stipulated to the entry into evidence, in lieu of trial testimony, of portions of the deposition testimony of Three Z's Brian Jansen. *See* DN 210.

[4] Watkoske left Veritiv in 2023. Trial Volume 3 at 45. But in 2021, during the events relevant here, he "was [the] senior vice president for paper or print and publishing." *Id.*

distributors rarely if ever shared this information with each other.  As Watkoske put it, "I've never had a supplier provide a competitor's purchase orders, history, pricing, rebates, terms, none of that."  Trial Vol. 3 at 57.  Yet an email exchange between Lindenmeyr's Harding and Phoenix's Grimm suggested prices that mirrored those offered through Veritiv.  Plaintiff's Exhibit 51 (DN 231-8).  And Grimm conceded that industry publications, like "RISI," could not be used to reverse-engineer a distributor's exact pricing.  *See* Trial Vol. 2-B at 117–119.   These "extremely important" terms, explained Rick Burdick (a longtime Veritiv salesman), form "part of th[e] equation" for the "net cost of the product."  Trial Vol. 2-A (DN 209) at 20:1–6. Accordingly, all employees signed confidentiality agreements, *see* Trial Vol. 3 at 54:19–21; Veritiv stored its price, payment, and order information on a protected network, *id.* at 55:1–9; and buyers (or their agents) signed confidentiality agreements, *id.* at 54:11–24; *see also* Plaintiff's Exhibit 38 (DN 221-11 at 5) (confidentiality agreement included in purchase order).

Nor was Veritiv's purchase history with Phoenix well known.  It detailed the size, type, and weight of paper requested by a consumer such as Three Z.  *See* DN Trial Vol. 3 at 56 (These orders include "details as to the size of the paper and the type of paper and the weight of the paper," and were "placed with Phoenix Paper under [Veritiv's] terms and conditions.").  Veritiv's sales team solicits orders through conversations with customers, compiles information into the order form, and distributes the orders to the supplier.  *See* Trial Vol. 3 at 28, 56. Plaintiff's Exhibit 38 (DN 221-11) (example Purchase Order).  Watkoske testified that he "never" knew of a merchant sharing order histories with another merchant or a merchant's competitor.  Trial Vol. 3 at 56.  This was central to the distributor business model: "It's very difficult for a merchant to bring any value to the equation in that other than handling [purchase orders] and taking an order and assuming a credit risk."  Trial Vol. 3  at 28 (Devens).

### III.   The Verdict

Based on this evidence, and after weighing the credibility of witnesses who in some instances told diametrically opposed stories, the jury found in Veritiv's favor across the board.  It specifically agreed that Veritiv and Three Z had a valid business relationship, with which Phoenix intentionally and improperly interfered by making intentional misrepresentations to Three Z regarding Veritiv's payment history.  *See* Jury Instructions at 19–20 (Verdict Form A).  And for this tortious interference, the jury awarded Veritiv $2.4 million.

Given this finding, the jury went on to consider whether Veritiv deserved punitive damages.  That is, whether Veritiv proved by clear and convincing evidence that Phoenix acted with malice, oppression, or fraud when it interfered with the

Veritiv-Three Z relationship. *Id.* at 16–17. No award of punitives, the jury heard, could rest on sympathy, bias, or prejudice, in lieu of "calm discretion and sound reason." *Id.* at 17. The jury agreed that Phoenix had carried out its tortious interference with "oppression, fraud, or malice." *Id.* at 20. In response, the jury awarded $7.2 million in punitive damages based on the likelihood of harm from Phoenix's misconduct, Phoenix's awareness of that likelihood, and the profitability, duration, and concealment of the misconduct to or by Phoenix. *Id.* at 16.

As to misappropriation, the jury held that Veritiv possessed and Phoenix disclosed a trade secret regarding Veritiv's negotiated payment terms and pricing with Phoenix, as well as its sales history with Three Z. *Id.* at 22 (Verdict Form B). It awarded $100,000 in damages for payment terms and sales history, plus $200,000 for pricing terms. *Id.* at 23. The jury also determined that Veritiv had proved, by clear and convincing evidence, that this misappropriation was willful and malicious. *Id.* at 24 (Verdict Form C).

As to breach, the jury concluded that Phoenix breached the terms of the Purchase Orders in a manner that harmed Veritiv. But it awarded only $1 in damages. And with respect to *Phoenix*'s counterclaim for breach, the jury agreed that the Supplier Packet constituted a binding contract between Veritiv and Phoenix, but that the timing of Veritiv's payments did *not* breach that agreement. *Id.* at 26 (Verdict Form E).

## IV.  Phoenix's Challenges to the Jury's Liability Findings

Phoenix's post-trial motions challenge each of these liability findings. It's entitled to judgment as a matter of law on the tort, trade-secret, and breach-of-confidentiality claims, Phoenix contends, because no reasonable jury could've reached the conclusions this one did. In the alternative, it seeks a new trial on each of Veritiv's claims—plus its own counterclaim for breach—because the jury's verdict ran against the weight of the evidence and was influenced by passion or prejudice as indicated by the size of the damages amounts. Motion at 1.

On each claim, Phoenix presents a plausible (or at least nearly plausible) counternarrative to the one presented by Veritiv. Namely, that Veritiv *had* in fact been paying late, that Grimm and Umenhofer spoke truthfully about Phoenix's financial and trust concerns regarding Veritiv, and that Lindenmeyr had no trouble in securing Three Z business based on publicly available information—without any need for Veritiv's confidential pricing terms, payment terms, and order histories.

Perhaps Phoenix's view of the proof is the better one, in at least some respects. But after six days of testimony, a dozen witnesses, and a thousand pages of trial transcript, this jury decided otherwise. Given this record, the view of the proof

8

advanced by Veritiv and accepted by the jury is at least reasonable, too. And once a jury has spoken, a trial judge's authority to set aside the verdict is extraordinarily limited. Under those highly deferential standards, and after viewing the same documents and hearing the same testimony as the jury, this Court cannot conclude that the jury acted unreasonably in its decisionmaking. So the liability verdicts on all four claims, including Phoenix's counterclaim, must stand.

### A. Tortious interference

A reasonable jury could've reviewed Veritiv's evidence and accepted its theory of the case. Veritiv and Three Z plainly had an ongoing and valid arrangement for the purchase of Phoenix's paper. And Phoenix plainly knew this. The steps its executives took to arrange a new purchasing arrangement through Lindenmeyr damaged Veritiv by ending (at least in part) its profitable sales and customer relationship with Three Z. *See generally PBI Bank, Inc. v. Signature Point Condominiums LLC*, 535 S.W.3d 700 (Ky. Ct. App. 2016). That much Phoenix's post-trial motion leaves largely undisputed.

But Phoenix challenges the sufficiency of the evidence with respect to three elements of the tort claim: intentional interference in the form of lies about Veritiv's payment performance, improper motive when Phoenix sought to switch distributors, and whether Phoenix's statements to Three Z actually caused Three Z to switch to Lindenmeyr.

First, Phoenix contends that no jury could reasonably find that Phoenix lied about Veritiv's payment performance, Motion at 6, because it truly believed that Veritiv's 45-day payment term exceeded that of any other merchant. But this argument simply reweighs the evidence. As recounted above, the jury heard that Phoenix's complaints about timeliness were part of a pretextual effort to achieve better pricing: that the mill never raised the issue of timeliness of payments until *after* Grimm sought to increase Phoenix's profits, that it pursued the issue much more consistently with Lindenmeyr and Three Z than in any earnest attempt to alter Veritiv's practices, and that Veritiv's prompt follow-up disbursements and suggestions for faster electronic payments were ignored. *See* Trial Vol. 2-B at 6–15; Defendant Exhibit 1 (DN 221-12).

And the 45-day payment term, as discussed in greater detail below, was explained by Veritiv partnering with Phoenix as a startup mill. By bringing Phoenix business as the mill began operations, Veritiv received the benefit of a 45-day payment term. *See, e.g.*, Trial Vol. 2-A at 48 (Moreau). So while a jury reasonably could've inferred that Phoenix was upset with lopsided financial terms imposed by its initial distributor, it likewise could've inferred that concerns over payment timeliness were disingenuous—just a fig leaf used to pursue a new and more profitable

arrangement with Lindenmeyr and Three Z. If the latter, that would suffice to support the jury's finding that Phoenix intentionally interfered—by misrepresenting its concerns about payment timing—with Veritiv's relationship with Three Z. *See* Instructions at 4–5.

Second, Phoenix argues that its purportedly neutral motivation—to increase profits—couldn't have amounted to an improper motive. Motion at 9. Veritiv doesn't really challenge Phoenix's characterization of its ultimate motive. Instead, it notes that the element is not *limited* to consideration of motive but also includes improper means, lack of justification, and malice. Response Opp. at 6 (citing *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (Ky. 1991)). "Under Kentucky law, tort liability exists for the interference with a known contractual relationship, if the interference is malicious or without justification, *or* is accomplished by some unlawful means such as fraud, deceit, or coercion." *Steelvest*, 807 S.W.2d at 487 (emphasis added).

Under this standard, the jury could've reasonably concluded that Phoenix acted contrary to "custom and tradition." *See Ventas, Inc. v. Health Care Prop. Invs., Inc.*, 635 F. Supp. 2d 612, 624 (W.D. Ky. 2009). Specifically, it met with Three Z, Veritiv's customer, without Veritiv's knowledge. *See* Trial Vol. 2-B at 49–50 (Grimm describing meeting). To some of the witnesses, this behavior was "[a]bsolutely shocking." Trial Vol. 1 at 175 (Wagner). The jury also heard that during these meetings, Phoenix relayed misleading information about Veritiv's "excessively" slow payment history to convince the consumer to switch merchants. Trial Vol. 2-B at 99:2–3. That Phoenix worked in "secret" with Veritiv's competitor surely could support the jury's finding of an improper motive or means. *See PBI Bank*, 535 S.W.3d at 716 (defendant's "secret" meetings and withholding of information to profit at plaintiff's expense supported jury verdict).

Third, Phoenix complains that its statements couldn't have caused Three Z to switch distributors. *See* Motion at 10 ("Veritiv presented no evidence at trial showing that Three Z agreed to switch to Veritiv to Lindenmeyr because of any statement that Phoenix made about Veritiv's payment history."). The evidence plainly refutes that argument. Three Z's representative, Brian Jansen, said his company had never complained about Veritiv's service. Trial Stipulation (DN 210-1) at 11 (presenting Jansen deposition excerpts). He further added that he had "concerns" switching to Lindenmeyr because, generally, Phoenix likes to "have several different distributors or several different merchants providing similar product." *Id.* at 12. But the fact that "Veritiv was slow paying" motivated Three Z's switch to Lindenmeyr. *Id.* Such a rationale closely follows Grimm's comments in his meeting with Three Z, in which he mentioned that Veritiv was "excessively slow paying." Trial Vol. 2-B at 99. These statements, in tandem with proximity of the October 2021 meeting and Three Z's

decision to switch distributors, would allow a reasonable jury to infer that Phoenix caused ("or was a substantial factor in causing") Three Z's switch to Lindenmeyr. *See* Jury Instructions at 4; *Bailey v. N. Am. Refractories Co.*, 95 S.W.3d 868 (Ky. Ct. App. 2001) ("To find causation, the jury naturally draws inferences from circumstantial evidence.").

### B. Trade secrets

Phoenix next argues that the jury lacked sufficient evidence to find that Phoenix had misappropriated three trade secrets. To establish a violation of Kentucky's trade-secrets law, a plaintiff must show (1) that it had a trade secret and (2) that the defendant misappropriated that trade secret. *Alph C. Kaufman v. Cornerstone Industries Corp.*, 540 S.W.3d 803, 818 (Ky. Ct. App. 2017). Federal law (the "Defend Trade Secrets Act") contains materially identical requirements. *See, e.g.*, *C-Ville Fabricating, Inc. v. Tarter*, No. 5:18-cv-379, 2019 WL 136821, at *14 (E.D. Ky. Mar. 26, 2019) (characterizing the laws as "nearly identical"); *compare* KY. REV. STAT. § 365.880, *et. seq.*, *with* 18 U.S.C. § 1836, *et seq.* To be a trade secret, information must (1) have independent economic value, (2) not be generally known or readily ascertainable by proper means, and (3) be subject of reasonable efforts to maintain secrecy. *Kaufman*, 540 S.W.3d at 818; *see also* Jury Instructions (DN 201) at 6–9.

The jury found that Veritiv had established Phoenix's liability for misappropriating three trade secrets: the payment terms that Veritiv had negotiated with Phoenix, the prices at which Veritiv sold paper to Three Z, and Three Z's sales history with Veritiv. Jury Verdict (DN 201) at 22. Phoenix disputes each of these findings. But Phoenix's arguments mostly reweigh the evidence the jury considered and reasonably rejected.

This evidence, although not overwhelming, provides some basis for a reasonable jury to determine that this information is a trade secret. And by presenting some evidence that "such information is not publicly known or otherwise ascertainable by proper means," a reasonable jury could, and did, find in the Veritiv's favor. *Smart & Associates, LLC v. Independent Liquor (NZ) Ltd.*, 226 F. Supp. 3d 828, 856 (W.D. Ky. 2016) (citations omitted).

**1. Payment terms.** The first trade secret at issue concerns the terms on which Veritiv paid Phoenix's invoices. Although the industry standard appears to have called for wholesalers like Veritiv to pay their suppliers within 20 days, Veritiv had negotiated a longer 45-day window. And whenever Veritiv paid an invoice within 45 days, it could deduct one percent from the total amount it owed Phoenix. Trial Vol. 2-B at 20–21.

As noted above, the jury heard evidence that this payment term was integral to Veritiv's wholesale distribution "program"—the confidential "orders, history, pricing, rebates, terms" that Veritiv used to deliver products to its clients. Trial Vol. 3 at 57. This information, taken as a whole, had "independent economic value" to Veritiv. *See Mike's Train House, Inc. v. Lionel, Inc.*, 472 F.3d 398, 411 (6th Cir. 2006) ("A trade secret can exist in a combination of … components, each of which, by itself, is in the public domain, but the unified process, design and operation of which … affords a competitive advantage and is a protectable secret.").

Meanwhile, testimony from executives of Veritiv, Phoenix, and Three Z was unanimous that the payment terms between a supplier and a distributor were not generally known or shared within the industry. Brian Jansen of Three Z testified during his deposition that he cared (at least somewhat) about this sort of information between his upstream business partners, and that usually he "ha[d] no idea" what arrangements exist. Jansen Deposition (DN 210-1) at 5 (entered by stipulation at trial). Mike Grimm, Phoenix's CEO, likewise conceded that he had "no recollection of sharing with an end customer [his] payment terms with the distributor" before doing so in this case. Trial Vol. 2-B at 50. And longtime Veritiv salesman Rick Burdick testified that keeping payment terms confidential was "extremely important": "when you get right down to it, the net cost of the product is – the payment terms are part of that equation, so as much as it's important to keep costs confidential, your price confidential, it's very important to keep payment terms confidential as well." Trial Vol. 2-A at 20. So the jury could have concluded that these payment terms were not readily ascertainable by proper means.

And the jury heard testimony that Veritiv took pains to keep information like these payment terms secret. At a general level, longtime Veritiv salesman Dan Watkoske explained how the company's IT systems locked down information to salespeople on a "need to know" basis—even one salesperson within the company couldn't see the payment terms or pricing information of a colleague's contracts without a good reason. *See* Trial Vol. 3 at 55. For similar reasons, all Veritiv employees signed confidentiality agreements. *Id.* Outside the company, Veritiv entered a contractual confidentiality agreement with its suppliers—including Phoenix—via a Supplier Packet that required "all specifications, data and other information furnished by Buyer, or its agents, to Seller in connection with these Terms or any order hereunder" to be kept confidential. Plaintiff's Exhibit 38. So the jury could have concluded that Veritiv took reasonable efforts to keep these terms secret.

As for misappropriation, the jury heard Mike Grimm testify that he had told Three Z that Veritiv had been paying "even out beyond 45 days." Trial Vol. 2-B at 99. Although Grimm denied that this was a veiled reference to the payment term, the

12

jury was free to disbelieve this explanation. *See Rasimas v. Michigan Department of Mental Health*, 714 F.2d 614, 623 (6th Cir. 1983) (explaining that trier of fact "need not credit a witness' explanation for making a particular statement"). After all, the jury also heard that 45 days was the payment deadline, departed from the industry standard, and triggered a prompt-pay discount for Veritiv. So the jury could have concluded that Phoenix misappropriated this secret.

Phoenix's primary counterargument is that Veritiv produced no evidence that disclosure of this secret caused actual financial harm. Motion at 16. But neither state nor federal law require proof that the disclosure caused monetary harm to prove misappropriation. That's because "[b]y statutory definition, trade secret misappropriation *is* harm." *Oakwood Laboratories LLC v. Thanoo*, 999 F.3d 892, 913 (3d Cir. 2021) (emphasis in original). A "trade secret's economic value depreciates or is eliminated altogether upon its loss of secrecy when a competitor obtains and uses that information without the owner's consent," so the "cognizable harm is pled when a plaintiff adequately alleges the existence of a trade secret and its misappropriation." *Id.*; *see also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1011 (1984) ("Once the data that constitute a trade secret are disclosed to others, or others are allowed to use those data, the holder of the trade secret has lost his property interest in the data."). So it doesn't matter that Veritiv requested only one dollar in damages for this claim. *See* Trial Vol. 6 (DN 219) at 18 ("On the damages on that, we would suggest one dollar on the negotiated payment terms, because that one didn't do any harm."); *Uzuegbunam v. Preczewski*, 592 U.S. 279, 290 (2021) ("When a right is violated, that violation 'imports damage in the nature of it' and 'the party injured is entitled to a verdict for nominal damages.'") (citations and quotations omitted). And it's hardly uncommon for courts to award nominal damages for misappropriation of trade secrets. *See, e.g.*, *Caterpillar Inc. v. Sturman Industries*, 387 F.3d 1358, 1365 (Fed. Cir. 2004); *Braun v. Medtronic Sofamor Danek, Inc.*, 141 F. Supp. 3d 1177, 1183 (D. Utah 2015).

The jury therefore had ample evidence to conclude that Phoenix had misappropriated Veritiv's payment-term trade secret.

**2. Pricing.** The jury also heard evidence that Phoenix had provided Lindenmeyr with Veritiv's pricing agreements with Three Z. This disclosure, too, satisfies each element necessary to prove a misappropriated trade secret.

As Burdick, the Veritiv salesman, testified, "[p]ricing is extremely confidential and extremely confidential for commodity grades of paper" because it is a primary raw material for Veritiv's customers. Trial Vol. 2-A at 19. "It's kind of like steel would be to a car, so it's very, very important to have competitive pricing and also to protect that pricing." *Id.* How a competitor like Lindenmeyr could use Veritiv's

13

pricing model to undercut its business model is therefore not hard to perceive.  Little wonder, then, that Veritiv would go to great lengths to protect its pricing—including by restating a similar disclaimer from the Supplier Packet that all information contained therein (including the pricing) "shall be treated by the Seller as proprietary and shall not be disclosed or used except as necessary to fulfill its obligations hereunder."  Plaintiff's Exhibit 38.  And each purchase order would also have been information "furnished" to Phoenix under the broader Supplier Packet.

The jury also heard evidence that Lindenmeyr executive Peter Harding had emailed Phoenix's Grimm to recommend how to increase prices to Three Z.  That email contained the baseline prices that Veritiv was presently charging Three Z.  Defendant's Exhibit 2; Plaintiff's Exhibit 51.  Phoenix contends that Harding could have learned this information some other way—such as by reverse engineering the pricing model using a database called RISI, through conversations that occurred back in 2020, or from Three Z itself.  But as noted above, Grimm conceded on cross-examination that no one could calculate the pricing data in Harding's email from RISI data alone.  And the jury heard testimony that the paper industry underwent avulsive change during the pandemic—such that, by 2021, any conversations from 2020 would have been useless to understanding contemporaneous pricing models.  Therefore the jury could have reasonably inferred from record evidence that Phoenix was the most likely source.

Phoenix offers two other counterarguments, neither of which persuades.

First, it contends that pricing (at least "Phoenix's" pricing) is not a trade secret.  Motion at 17.  But numerous cases hold otherwise.  *See, e.g.*, *Smart & Associates*, 226 F. Supp. 3d at 856 ("Business information such as pricing and customer sales information may constitute a protected trade secret under the UTSA where such information is not publicly known or otherwise ascertainable by proper means.").

Second, Phoenix contends that to the extent pricing is a trade secret, it doesn't belong to Veritiv.  Motion at 18.  The jury heard abundant testimony, however, that Veritiv, like other mills, worked with Phoenix to set the prices it offered Three Z, and then required Phoenix to keep that information secret through confidentiality agreements.  *See, e.g.,* Trial Vol. 4-B at 18 (Harding) (testifying that the merchant, not the mill, sets the price); *id.* at 45–47 (Umenhofer) (testifying that the merchant provides input to set the price); Trial Vol. 2-B at 19 (Pfister) (testifying that Veritiv's confidential information includes pricing); Trial Vol. 3 at 57 (Watkoske) (testifying that confidential pricing information is part of merchant's sales program).  Given the highly deferential standard of review, the Court must view this evidence in Veritiv's favor, which would allow a reasonable jury to infer that the pricing was a trade secret that Phoenix shared with Lindenmeyr.

**3. Order histories.** Finally, the jury heard evidence that Phoenix had provided Lindenmeyr a list of Three Z's pending orders—with a view toward Lindenmeyr taking them over from Veritiv (and ultimately filling them). Such a list would plainly have economic value and not be generally known to the public. Indeed, the jury heard evidence to that effect—including from Veritiv executive Jeff Pfister, who explained that such information was "confidential." Trial Vol. 2-B at 28. The jury also heard Watkoske testify that he "ha[d] never in my 33 years had a supplier provide me one of my competitor's information." Trial Vol. 3 at 56. That evidence was enough for the jury to conclude that this information was a trade secret.

And no one disputes that Phoenix executive Tom Umenhofer, with authorization from Grimm, supplied Lindenmeyr with a listing of all of Three Z's orders through Veritiv that were set to ship after November 1, 2021. Veritiv Response at 17 (citing Joint Exhibit 6 (DN 231-11, at 2)).

Phoenix (again) argues the disclosure caused Veritiv no harm. Motion at 20. Because Three Z ended up keeping its existing orders (though not subsequent orders from Phoenix) with Veritiv rather than switching to Lindenmeyr, Phoenix argues, Veritiv lost no sales and suffered no harm. *See* Trial Record Stipulation (DN 210-1) at 16. But Veritiv need not have actually lost sales for its trade secrets to have economic value. "If the benefit to the defendant in terms of direct profits is not ascertainable, damages may be awarded based on the value to the defendant of the secret at the time of misappropriation." *Avery Dennison Corp. v. Four Pillars Enterprise Co.*, 45 F. App'x 479, 486 (6th Cir. 2002) (citing *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 535–36 (5th Cir. 1974)). "[T]he law looks to the time at which the misappropriation occurred to determine what the value of the misappropriated secret would be to a defendant who believes he can utilize it to his advantage," whether or not he actually succeeds in doing so. *University Computing*, 504 F.2d at 536. Veritiv needn't provide a measure of specific damages when Phoenix benefited from the misappropriation. *Cf. Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 805 F.3d 701, 706 (6th Cir. 2015) ("Where damages are otherwise difficult to measure, the value of the secret to the misappropriating party can be a proper yardstick for a damage award.") (citations and quotations omitted).

### C. Veritiv's breach of contract claim

Veritiv's breach-of-contract claim relies on its confidentiality provision—as printed in its Supplier Packet and Purchase Orders—which barred disclosure of any information furnished by Veritiv to its sellers. *See, e.g.,* Plaintiff's Exhibit 117 (DN 231-12). Much of the same evidence that supported Veritiv's previously discussed tort claims support this finding, too: that Phoenix shared Three Z's purchase orders with Lindenmeyr, that Lindenmeyr's pricing (after conversations with Phoenix) echoed Veritiv's, and that Phoenix discussed Veritiv's specific payments terms and discounts. That's sufficient evidence to support the jury's verdict that Veritiv and Phoenix had a contract, Phoenix breached that contract, and the breach caused Veritiv damage. *See, e.g., Specialty Auto Parts USA, Inc. v. Holley Performance Prods., Inc.*, 726 F. Supp. 3d 735, 741 (W.D. Ky. 2024) ("A breach-of-contract claim under Kentucky law requires: (1) a valid and enforceable contract, (2) a breach of that contract, and (3) damages caused by that breach.").

Phoenix contends that "Veritiv did not present evidence from which a reasonable jury could conclude that Phoenix breached any contractual confidentiality obligation to Veritiv or that Veritiv was damaged as a result party." Motion at 22. Phoenix's opposition, however, merely echoes its trade-secrets contentions. *Id.* (As does Veritiv's response. *See* Response at 28). But Phoenix's reliance on its trade-secret arguments—which as explained above fell short of overturning the jury verdict—similarly fall short here. It has provided no persuasive reason to suggest that, as a matter of law, the breach of contract claim fails. Instead, Phoenix's arguments merely rely on a different view of the evidence. *See, e.g.*, Motion at 22 ("Veritiv presented no evidence."). In any event, this claim matters little to the judgment. As explained below, the Court remits any damages in excess of the agreed-to compensatory damages cap, which excludes the $100 damages the jury awarded for this claim.

### D. Other arguments for a new trial

Beyond its challenges to the evidence, Phoenix offers two additional arguments in favor of a new trial. These fare no better than its prior contentions.

First, Phoenix contends that "passion or prejudice" must've influenced the jury's verdict. Motion at 24. This argument relies on Misty Decker's testimony as Veritiv's expert: "In light of Ms. Decker's *unwarranted* assumptions and *unreliable* projections, Veritiv's lost profits calculation was inherently speculative." *Id.* at 26 (emphasis added). Phoenix had the chance, however, to rebut Decker's testimony. Yet its own expert, Culver Lamb, testified that he hadn't reviewed Decker's report, and he didn't offer rebuttal testimony of her opinions. Trial Vol. 5 (DN 217) at 91. Instead, Lamb offered testimony *only* to support Phoenix's counterclaim. *See id.*

16

(retained to "calculate the amount of discounts taken by Veritiv on payments that Phoenix Paper received after the discount due date"); *id.* at 91:14–20 (Lamb) (confirming that Phoenix had not retained him to rebut or respond to Decker's lost-profits opinions). To the extent Phoenix suggests Decker's testimony lacks credibility, a post-trial motion isn't the time for that argument (and the Court lacks any basis to indulge such an assumption in any event). Nor does Phoenix's bare assertion that the jury's acceptance of Decker's $2.4 million compensatory damages calculation proves "passion or prejudice." Motion at 25. Nor has Phoenix explained why the jury's "two hours of deliberation" somehow prove the jury's "passion or prejudice." *Id.* at 25. Viewed in Veritiv's favor, as the law compels, the record suggests that the jury accepted Decker's testimony as credible and awarded damages consistent with her testimony.

Nor is this verdict infirm because Decker based her opinions on "pure speculation." *See* Motion at 25 ("The jury's award of $2.4 million in compensatory damages on Veritiv's claim for tortious interference is excessive and unsupported by the evidence because the damages calculation that Veritiv presented at trial was pure speculation."). Instead, she testified regarding her methods and the data that informed her analysis. Decker explained that she familiarized herself with Veritiv's and Three Z's course of dealings, drew on Lindenmeyr's sales to Three Z through the date of trial, and then projected five years into the future, as recommended by the American Institute of Certified Public Accountants. Trial Vol. 4-A (DN 211) at 48–51. Her projections included a negative growth rate of five to seven percent to account for the likelihood of "shrinking" demand in the paper industry in the future. *See id.* at 51. That conservative trend, she explained, followed from the paper industry's standing as "an older industry"—having been disrupted by "the digital age." Trial Vol. 4-A at 51:16–22. And she applied a discount rate for any lost sales beyond the trial date. *See id.* at 55:1–13. Phoenix had the opportunity to rebut these calculations with its own expert's opinions. But it did not. Based on Decker's testimony, the jury's verdict is surely "one which reasonably could have been reached." *Denhof v. City of Grand Rapids*, 494 F.3d 534, 543 (6th Cir. 2007).

Second, Phoenix contends that a new trial is necessary because the jury ruled inappropriately on its sole counterclaim: that Veritiv breached a contract by claiming discounts to which it was not entitled. Under Phoenix's agreement with Veritiv, when Veritiv paid within 45 days of receiving an invoice, it received a 1% discount. During the life of the contract, Phoenix maintained that Veritiv claimed $841,575 in improper discounts based on thousands of orders and payments. *See* Trial Vol. 5 at 88:4–5 (Lamb) testifying that Veritiv took "$841,574.81" in "total discounts, unauthorized discounts"). Phoenix asserted, however, that, on most of these

occasions, Veritiv's payments were late, so it was not entitled to the discount. Motion at 39.

This dispute largely turned on expert testimony. The two experts disagreed about the timeliness of Vertiv's payments. Lamb, called by Phoenix, testified that Veritiv took $841,574.81 in unauthorized discounts. Trial Vol. 5 at 88. But Decker, Veritiv's expert, rebutted Lamb's calculations. Decker explained that Lamb's figure failed to account for weekends and holidays, which affected payment due dates. Trial Vol. 4-A at 28. Based on Decker's analysis, Veritiv's "potential discounts that should not have been taken" amounted to roughly $25,000. DN 211 at 47:15–16. She qualified that figure as "potential" because her team later "looked at other documents," which indicated that even those payments were not late. *Id.* And she explained that Lamb sometimes relied on a 20-day payment term, contrary to invoices showing "one percent 45, net 46." Trial Vol. 4-A at 42–44. The jury apparently accepted Decker's version of events, instead of Lamb's less complete account, in finding that Phoenix failed to establish a breach of contract. That conclusion, based on this testimony and evidence, hardly entitles Phoenix to a new trial on this claim.

## V.    Phoenix's Challenges to Damages

**A. Punitive Damages.**    The jury found, under a clear-and-convincing evidentiary standard, that Phoenix carried out its tortious interference with "oppression, fraud, or malice." Jury Instructions at 16. On that basis, it awarded Veritiv an additional $7.2 million in damages—three times its actual-damages award of $2.4 million. Phoenix challenges this award on three grounds. First, under Kentucky law "no reasonable jury could find, by clear and convincing evidence, that Phoenix acted with oppression, fraud or malice toward Veritiv." Motion at 12. Second, the conscience-shocking amount of punitive damages compels amendment under Rule 59. *Id.* at 27. Third, the punitive-damages award violates the federal Due Process Clause because Phoenix's conduct wasn't "sufficiently reprehensible." *Id.* at 31. Notably, Phoenix's motion does *not* challenge the content of any of the jury instructions about punitive damages (or about anything else, for that matter).

**1.** *Sufficiency of the Evidence.*    Could a reasonable jury have found by "clear and convincing evidence" "that Phoenix acted with oppression, fraud, or malice toward Veritiv"? Motion at 12. No, says Phoenix, because the malice required for punitive damages must rest on something beyond the improper conduct required for tortious interference—"something more than merely a commission of the tort." *PBI Bank*, 535 S.W.3d at 726 (citing *Fowler v. Mantooth*, 683 S.W.2d 250, 252 (Ky. 1984).

Here, the jury could well have inferred malice, or "conscious wrongdoing," *PBI Bank*, 535 S.W.3d at 726, from Phoenix's plan to lure Three Z's business from Veritiv after a successful two-decades-long partnership. *See* Trial Vol. 1 at 148 (Wagner)

18

(testifying that "Three Z had been a customer of Veritiv's [before] … 2000."). The jury heard evidence that Phoenix had relied on secret meetings with competitors and consumers—a stark departure from industry norms—and made misleading statements of Veritiv's payment history in an effort to impugn Veritiv's reputation. *See* Trial Vol. 2-B at 99 ("excessively slow paying"); *id.* at 120 (lack of "trust"). Crediting this proof, it's hardly surprising that Three Z pivoted to another distributor after having heard Veritiv's reliability called into question.

The coordinated and planned timing of Phoenix's scheme permits an inference of conscious wrongdoing. As set out above, the jury heard that Phoenix, under Grimm, decided to change distributors to improve its financial position. This alone didn't violate any contractual commitment, as Phoenix emphasizes. But the manner in which it pursued this transition to Lindenmeyr matters. *See Ventas*, 635 F. Supp. 2d at 622 (evidence of a "manner procedurally at odds with custom and tradition" provided enough evidence to the jury "to permit inferences of improper motives"). Rather than attempt to renegotiate terms or demand an exit, the evidence indicated that Phoenix contrived a history of late payments by Veritiv, Defense Exhibit 1 (DN 221-12) at 1–4 (September 21 email from Phoenix's Umenhofer to Veritiv's Pfister about Veritiv's past-due balances), solicited from Veritiv a response—that its payments had been largely if not entirely on time, *id.*—that Phoenix then ignored, *id.*, and then presented this payment-and-performance information to Veritiv's customer in a manner intended to place Veritiv in a false light and ultimately terminate its relationships, Trial Vol. 2-B at 99 (Grimm describes Veritiv as "excessively slow paying"). And these misrepresentations transgressed industry customs. *See* Trial Vol. 2-B at 56 (Watkoske) ("I have never in my 33 years had a supplier provide me one of my competitor's information."). Simultaneously, Phoenix executives began a series of secret meetings with Lindenmeyr, and leaked confidential information to help Lindenmeyr take the Three Z account. *See* Defendant's Exhibit 3 (DN 231-4) (September 26 email from Lindenmeyr's Harding about the "plan" for a meeting with Three Z); Joint Exhibit 6 (DN 221-10 at 4) (October 15 email with Lindenmeyr to "share the breakdown of the orders prior to our call with 3Z this afternoon").

Whether this is the fairest or best characterization of Phoenix's conduct and motives is of course hardly clear—but that is not the proper question for a judge reviewing a jury verdict after the fact. The question is instead whether the jury *could've* reasonably believed the tale as Veritiv told it. *Cf. PBI Bank*, 535 S.W.3d at 726 (evidence supported conclusion that defendant-company "desired to rid itself of the [plaintiff's] loans, and worked behind [the plaintiff's] back to acquire the property by fraudulently representing that it was not aware of any party interested in purchasing the property, and by making promises it never intended to keep"). Here

19

too, Veritiv presented evidence that Phoenix misrepresented its payment history to induce Phoenix to switch distributors—despite Veritiv's reassurances that it *had* paid on time. That evidence, and more, prompted the jury to accept Veritiv's narrative— that Phoenix "didn't have the right … to lie, cheat, or steal" to convince Three Z to switch distributors. *See* Trial Vol. 5 at 206. Veritiv receives "the benefit of all reasonable inferences that may be drawn from the evidence." 9B WRIGHT & MILLER § 2524. And the evidence shows it could've found that Phoenix's misconduct involved "'conscious wrongdoing' or malice" on these facts—as in other punitive-damages situations. *See PBI Bank*, 535 S.W.3d at 726 (citing Fowler, 683 S.W.2d at 252).

**2. *Rule 59.*** Amendment of the judgment under Rule 59—often known as remittitur of damages—is permissible only when an award is "(1) beyond the range supportable by proof; (2) so excessive as to shock the conscience; or (3) the result of mistake." *Gregory v. Shelby County*, 220 F.3d 433, 443 (6th Cir. 2000). "A trial court is within its discretion in remitting a verdict only when, after reviewing all evidence in the light most favorable to the awardee, it is convinced that the verdict is clearly excessive, resulted from passion, bias or prejudice; or is so excessive or inadequate as to shock the judicial conscience of the court." *Id.* The review is thus "extremely deferential." *Advance Sign Grp.*, 722 F.3d at 787.[5]

Phoenix contends the jury made a mistake by failing to consider its ability to pay the punitive-damages award. Motion at 28 (pointing to firm's losses in 2020 and 2021). But Phoenix presented no evidence at trial of its (in-)ability to pay—so the

---

[5] The parties agree that some form of this federal standard applies here. *See* Motion at 35; Response to Motion at 21, 28. Yet in the same vein as the issue discussed above (at n.1), some Sixth Circuit precedent points to the law of the forum state as determining whether a challenged verdict is excessive and thus warrants remittitur under Rule 59. *See, e.g.*, *Tezak v. Montgomery Ward & Co.*, 33 F. App'x 172, 176 (6th Cir. 2002) ("Rule 59 governs the procedural question of whether to grant a new trial, and the law of the forum state, Michigan in this case, determines the substantive question of whether a challenged verdict is inadequate or excessive."). And the Supreme Court's decision in *Gasperini v. Center for Humanities*, likewise endeavored to reconcile the Federal Rules and substantive state rules about whether verdicts were excessive. 518 U.S. 415, 427 n.7 (1996) (interpreting the Federal Rules "with sensitivity to important state interests and regulatory policies").

The question is merely academic here, however, because even the "extremely deferential" federal "shocks-the-conscience" standard is—if anything—more protective of defendants than state law, even assuming it survives *Berk v. Choy*, as discussed above. The Kentucky Supreme Court has held that state law provides no basis for "court-ordered remittitur of punitive damages or for the fixing of the amount of such damages." *Hanson v. American National Bank & Trust Co.*, 865 S.W.2d 302, 310 (Ky. 1993) (declining to "establish such precedent" for remittitur under Kentucky law).

jury necessarily couldn't have made a mistake in overlooking such information.  *See, e.g., Johnson v. Howard*, 24 F. App'x 480, 488 (6th Cir. 2001) ("[I]t is the defendant's burden to present evidence of his ability to pay when he would like that information to be considered by the jury.") (collecting cases).

Relatedly, Phoenix contends that a passing reference at trial to its Chinese parent company led the jury to think it could (or should) pay a hefty punitive-damages sum.  *See* Motion at 28.  This concerns an evidentiary issue that the Court considered repeatedly and carefully.  During the final pretrial conference, the Court granted in part a motion to exclude testimony regarding Phoenix's Chinese parent company or Chinese ownership.  *See* DN 180.  That ruling precluded Veritiv from placing "unnecessary attention on the fact of Chinese ownership."  DN 190 at 54.

During opening, however, Phoenix mentioned Veritiv's size as a once-Fortune 500 company and the "dynamic … that [Phoenix was] the little guy being beat up by the bully."  *Id.* at 4:18–20.  In response, Veritiv asked permission to introduce "limited" testimony about Phoenix's "overall parent company" and its "substantial size."  Trial Vol. 2-A at 4.  The Court agreed, but cautioned Veritiv that such questioning should not tread into "geopolitics" or anything potentially inflammatory.  *Id.* at 5.  So Veritiv asked Grimm a handful of questions about his employer (Global Win, the parent company of Phoenix), *see* Trial Vol. 2-B at 33–34, and its own parent, Shanyang International, which owns dozens of paper, packaging, and renewable resource companies, *see id.* at 33:1–19 (Grimm).  This line of inquiry was quite limited (just a single transcript page among approximately a thousand), and Veritiv didn't mention any details about the "nationality of any party or witness," Motion in Limine DN 147 at 5.

With respect to Phoenix's finances specifically, nothing should've given the jury a false impression of its ability to pay a punitives award.  Grimm testified that Phoenix lacked direct access to additional funds: Phoenix couldn't just "draw money out of a bigger corporation" if and when it needed.  Trial Vol. 2-B at 61.  These few comments, made over the course of a six-day trial, hardly suggest that the jury mistakenly or harshly imputed the parent company's wealth or assets to Phoenix.  Nothing in the record indicates that the jury "treat[ed] [Phoenix] as if it had the wealth of the parent company in China."  *Contra* Motion at 28 (quoting *Beijing Tong Ren Tang (USA) v. TRT USA Corp.*, 2011 WL 13143358, *5–6 (N.D. Cal. Nov. 23, 2011).

Nor does the sheer amount of punitive damages prove the sort of prejudice or bias that shocks the conscience and thus would require a new trial.  "The jury's decision to triple the multi-million-dollar compensatory award and to hold Phoenix additionally liable for $7.2 million in punitive damages based on a commercial

dispute," it argues, "is completely divorced from the evidence, any cognizable theory of liability[.]" Motion at 26. But Phoenix offers no caselaw or reason why the jury's decision to award punitives in a multiple of three times actual damages, absent other concerning indicators, evinces the sort of "sympathy, or bias, or prejudice" that the jury instructions warned against. Jury Instructions (DN 201) at 16.

**3. Due Process**. Finally, Phoenix argues that the jury's $7.2 million punitive-damages award is unconstitutional. *See* Motion at 29–36. The Supreme Court has interpreted the Fourteenth Amendment's Due Process Clause to "prohibit[t] the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). This rule rests on concerns about "fair notice … of the severity of the penalty that a State may impose." *BMW of North America v. Gore*, 517 U.S. 559, 574 (1996).

To determine whether a particular punitive-damages award is "grossly excessive or arbitrary," the Supreme Court has offered three "guideposts": the reprehensibility of the defendant's conduct, the damages award's disparity with the actual or potential harm the plaintiff suffered, and the delta between the jury's award and the civil penalties available in comparable cases. *See id.* at 575; *State Farm*, 538 U.S. at 419. The first guidepost itself contains five more "factors." *Id.* Specifically, reprehensibility turns on whether "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *State Farm*, 538 U.S. at 419. Despite or perhaps because of these many considerations, the Supreme Court has cautioned that its jurisprudence offers "no rigid benchmarks," affords judges discretion to assign substantial weight to a subset or even a single relevant factor given the facts of a particular case, and compels an inquiry into the precise "facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Id.* at 424–25. In sum, "[t]he principles set forth in *Gore* must be implemented with care, to ensure both reasonableness and proportionality." *Id.* at 428.

Whether these guideposts and factors permit evaluation of damage awards "based upon an application of law, rather than a decisionmaker's caprice," *id.* at 408, is not obvious—given that they often lead thoughtful jurists to reach markedly different conclusions on the same factual record. *Compare, e.g., Clark v. Chrysler Corp.*, 436 F.3d 594, 596 (6th Cir. 2006), *with id.* at 612 (Kennedy, J., concurring in part and concurring in the judgment), and *id.* at 614 (Moore, J., concurring in part and dissenting in part) (three judges applying the factors to reach three different, yet

well-reasoned, conclusions about propriety of punitive-damages award); *Kidis v. Reid*, 976 F.3d 708, 715 (6th Cir. 2020), *with id.* at 723–24 (Griffin, J., concurring in part and dissenting in part) (similar). That reality should counsel a healthy dose of humility from a judge considering in hindsight whether to displace the "moral judgment" that a jury rendered in real time as having violated the Constitution. *Smith v. Wade*, 461 U.S. 30, 52–54 (1983). *See also City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 270 (1981) (describing "broad discretion traditionally accorded to juries in assessing the amount of punitive damages").

Here, the jury awarded $7.2 million in punitive damages alongside $2.4 million in compensatory damages on the plaintiff's tortious-interference claim. None of the principles the Supreme Court has articulated suggests that award violates the Constitution. The reasons why are largely reflected in the facts and instructions as recounted above in support of the jury's determination to award punitive damages in the first place. Indeed, "much of the evidence bearing on the [liability] question bears on the [punitives]" question as well. *Gibson v. Moskowitz*, 523 F.3d 657, 664 (6th Cir. 2008).

*Reprehensibility*. Whether the harm suffered by Veritiv resulted from "intentional malice, trickery, or deceit," as opposed to "mere accident," bears on the reprehensibility of Phoenix's conduct. *See* Motion at 32; Response at 31–32. But ample evidence supports the conclusion that Phoenix operated intentionally and maliciously here.

As discussed above, Three Z's relationship with Veritiv was longstanding and substantial before Phoenix interfered. One of the largest buyers of paper in North America, Three Z purchased "one hundred truckloads of paper a month" from Veritiv. Trial Vol. 1 at 149. This was a customer that Veritiv considered "very important" and "large" based on the "sheer size" of its purchase volume. *Id.* at 149. That relationship had existed for more than two decades. *See id.* at 148. And when Phoenix purchased the downtrodden Wickliffe Mill in 2020, Veritiv took the risk of purchasing freecoat paper from this mill, which had been shuttered for years. And but for Veritiv and its relationship, "Phoenix had no knowledge of Three Z Printing, and … Three Z Printing had no knowledge of Phoenix without Veritiv." Trial Vol. 1 at 153. As a quid pro quo familiar to the wholesaling business, in exchange for its investment Veritiv received the benefit of longer terms for its payments to Phoenix. At least at the outset, Phoenix, Veritiv, and Three Z were "all working together on a common good." *Id.* at 154.

But Phoenix wanted to "reset the relationship with Veritiv." Trial Vol. 2-B at 83. And it wanted to do so at a time when a global pandemic—"coming out of 2020 and into 2022"—caused "shortages" of paper. Trial Vol. 1 at 164. As one witness put it, "paper was less … available in the marketplace." *Id.* Despite this instability, Grimm prepared to take a risk: he wanted out of the pricing commitment to Veritiv that thwarted his profit-maximizing plans. *See* Joint Exhibit 2 (DN 221-10) at 4. So he turned to Veritiv's competitor, Lindenmeyr, and emailed about its interest in the Three Z account. Defendant's Exhibit 3 (DN 231-4). And they discussed a few options—perhaps, said Lindenmeyr's Harding, Phoenix should tell Three Z that "Veritiv was selling below the market." *Id.* But Phoenix had another idea. It emailed Veritiv—for the first time in over two years—about overdue balances. Defendant's Exhibit 1 (DN 221-12) at 1–4. When Veritiv responded that it most of those invoices had been paid, Phoenix said nothing more, besides expressing its openness to Veritiv's suggestion that it switch to ACH payments to mitigate any future misunderstandings or delays based on Phoenix's obsolete use of paper checks. *See id.*

But Grimm continued to email Lindenmeyr about the prospect of acquiring Three Z's business from Veritiv—and unleashing Phoenix from its price-and-payment commitment in the process. And Grimm and Umenhofer met with Three Z on October 13. *See* Trial Vol. 2-B at 98. At this meeting, Grimm told Three Z that Veritiv was "excessively paying us slowly." *Id.* at 99. (This despite Veritiv's assurances that it *had* paid the outstanding balances. *See* Defense Exhibit 1 (DN 221-12). But his comments didn't stop there; he also told Three Z he didn't "trust" Veritiv. *See* Trial Vol. 2-B at 120. Yet he *never* communicated with a single Veritiv employee before sharing that opinion. *Id.* Despite Three Z's two-decade satisfaction with Veritiv, Phoenix's plan succeeded when Three Z switched to Lindenmeyr.

As Veritiv's attorney put it to the jury in his closing argument, Phoenix could have tried to increase its revenue—on the level—in many other ways. Phoenix could have

> stopped selling to Veritiv. They could have gone to Three Z to try to go direct. They could have gone to Three Z through Lindenmeyr. They had the right to do that. What they didn't have the right to do was to lie, cheat, or steal to make it happen. They didn't have the right to … improperly interfere. They didn't have the right to say things that weren't true. They didn't have the right to say they didn't trust us when they never talked to us. That our relationship was bad when you heard

24

how good the relationship was. They didn't have the right to do it that way.

Trial Vol. 5 at 206.

The jury reasonably determined, based on the evidence that supported this closing argument, that Phoenix's conduct flowed from "intentional malice" rather than "mere accident." *State Farm*, 538 U.S. at 419. The record, including extensive testimony from several industry veterans, supported the notion that Phoenix could've approached other market players in a transparent attempt to improve the terms it got from Veritiv. Instead, the jury heard, it chose to manufacture a conflict with Veritiv that cast its distributor's diligence and honesty in a dim and disingenuous light. That sort of intentionally malicious conduct is the touchstone of reprehensibility under the federal standard. *See Romanski v. Detroit Entertainment*, 428 F.3d 629, 644–45 (6th Cir. 2005).

In reviewing the multifactorial due-process analysis discussed above, some Sixth Circuit cases have questioned punitive-damage awards (or their size) based only on maliciousness—without physical harm, an especially vulnerable victim, or repeated misconduct. *See, e.g.*, *Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 1001 (6th Cir. 2007); *Bridgeport Music, Inc. v. Justin Combs Pub.*, 507 F.3d 470, 490 (6th Cir. 2007). *Magnuson*, for example, involved the violation of a single employee's non-compete agreement after an insurance company sale. 487 F.3d at 990. The proof, the panel emphasized, didn't involve physical harm, a vulnerable victim, or repeated misconduct. *Id.* *Bridgeport*, meanwhile, permitted a punitive-damages award for copyright infringement in an album's title track based only on malice. But the court reduced the damages ratio from 9:1 to something "closer to 1:1 or 2:1" based on analysis more consonant with *Gore*'s second guidepost (disparity between actual harm and punitive damages). 507 F.3d at 487–90.[6]

---

[6] Some courts have quoted *Bridgeport*'s passage that "where only one of the reprehensibility factors is present, a ratio in the range of 1:1 to 2:1 is all that due process will allow." *See, e.g.*, *Cummings v. BP Prods. N. Am., Inc.*, 648 F. Supp. 2d 969, 985–86 (M.D. Tenn. 2009). To the extent they read that statement as setting a rule, that misreads the statement in its context. Indeed, the Sixth Circuit in *Bridgeport* said that its rule applied only "in this case"—after it had already concluded that the defendant's conduct was only "somewhat reprehensible." *Id.* at 486–87. The court did not—nor, given the Supreme Court's admonition that the *State Farm* factors brook no "bright-line ratios," *State Farm*, 538 U.S. at 425, could it have—set out an ironclad legislative limit on punitive damages based on a single reprehensibility factor.

25

Here, as discussed above, the evidence supported the jury's conclusion that Phoenix had engaged in intentional, malicious, reprehensible conduct that threatened a company's longstanding business relationships during a particularly fraught moment for the paper industry. And Phoenix did so through a planned and hidden scheme involving repeated conduct. That suffices to justify at least some punitive-damage award.

*Ratio to Compensatory Damages.* As for the relationship between that award and the compensatory damages, the jury here apparently heeded Veritiv's attorney's request "to consider trebling" the amount of compensatory damages—"[n]ot ten times, not crazy numbers," but a figure "big enough that they feel it, and they won't repeat this to somebody else." Trial Vol. 5 at 210. The Supreme Court has consistently declined to draw a bright-line rule about the appropriate relationship between compensatory and punitive damages. *See State Farm*, 538 U.S. at 425 ("Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.") But the Court has acknowledged "a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish." *Id.*

The jury's punitive-damages award here sits comfortably amidst that long history. This case involves evidence of just the sort of misbehavior that punitive damages aim to deter: not ordinary commercial hard-dealing, but conduct where a party crosses from self-interested competition into willful harm to another's life or livelihood. *See Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 579 U.S. 93, 103–04 (2016) ("The sort of conduct warranting enhanced damages has been variously described in our cases as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate."). To be sure, "[o]ther cases presenting different allegations and different records may lead to different conclusions." *Twitter v. Taamneh*, 598 U.S. 471, 507 (2023) (Jackson, J., concurring). For example, as discussed above, the Sixth Circuit in *Bridgeport* determined that the "purely economic" harm at issue in that case was only "somewhat reprehensible," which meant that "a ratio in the range of 1:1 to 2:1 is all that due process will allow." 507 F.3d at 486–87. But the evidence provided the jury ample reason to conclude that Phoenix's conduct here did more than just threaten Veritiv's bottom line—it inflicted reputational harm on a long-time business partner through lies that intended to leave Veritiv no opportunity to defend itself, abused confidential

information to support its own ends, and threatened a publicly traded company during a global pandemic that had already thrown the paper industry into disarray. That is precisely the sort of conduct that punitive damages, in particular, has historically targeted.

*Relationship to Other Civil Penalties.* The Court's confidence in the jury's 3:1 ratio here is further buoyed by the number of state statutes that provide for treble damages for similar misconduct.[7]  Neither party gives this third guidepost much airtime, but Kentucky law reveals little disparity "between the punitive damages award and the "civil penalties authorized or imposed in comparable cases." *State Farm*, 538 U.S. at 428 (quotation marks omitted).   To take just two examples, Kentucky law permits treble damages for unfair trade practices—such as anticompetitive commercial conduct, geographic price discrimination, and below-cost sales designed to destroy competition, *see* KY. REV. STAT. § 365.020, *et seq.*—and misappropriation of trade secrets under the very same act the jury had already concluded that Phoenix violated, *see* KY. REV. STAT. § 365.884.  These "legislative judgments concerning appropriate sanctions for the conduct at issue" warrant "substantial deference." *Gore*, 517 U.S. at 583 (quotation marks omitted).  And they further underscore the propriety of the punitive-damages award here.

**\* \* \***

The jury's $7.2 million punitive-damages award falls well within the ground marked off by the Supreme Court's three guideposts, was wholly consistent with the (unobjected-to) jury instructions about how to consider punitive damages, and was supported by substantial evidence of Phoenix's malicious behavior.  So the Court has no cause to vacate or amend the judgment as a matter of law.

**B. Compensatory Damages.**   Phoenix also challenges the jury's compensatory- and punitive-damages awards.  Motion at 38.  The compensatory award, Phoenix argues, leads to "impermissible double recovery. *Id.* at 38.  And on

---

[7] Kentucky courts have approved similar 3:1 ratios between punitive and compensatory damages in common-law business-tort cases, too. *See, e.g.*, *PBI Bank*, 535 S.W.3d at 708, 726 (approving $5.5 million in punitive damages against a $1.5 million compensatory-damage award).  To be sure, treble damages ordinarily involve a 2:1 ratio between the punitive and compensatory damages (resulting in a total damage award that is three times the compensatory figure).  But the delta between 2:1 and 3:1 (or 3:1 to 4:1, depending on one's perspective) is exceedingly unlikely to prove of constitutional magnitude given that the Supreme Court has recognized some 700 years of history to justify "double, treble, or quadruple damages to deter and punish." *State Farm*, 538 U.S. at 425.

this point the parties agree. The jury awarded Veritiv $2.4 million for Phoenix's tortious interference, Jury Verdict (DN 201) at 20; $400,000 for Phoenix's misappropriation of trade secrets, *id.* at 23; and $1 for Phoenix's breach of contract, *id.* at 25. But Veritiv requested a *total* of $2.4 million in compensatory damages—and the evidence showed no greater loss than that. Motion at 38. Veritiv doesn't dispute this point: "all parties recognized prior to the deliberations that compensatory damages would be capped at just over $2.4 million total for all claims." Response at 27; *see* Vol. 5 (DN 217) at 25–27 (Veritiv's and Phoenix's attorneys agreeing that a jury verdict in excess of $2.4 million "will automatically be reduced"). "Where '[t]he defects in the award are readily identified and measured,' remittitur is more appropriate than a new trial." *Strickland v. Owens Corning*, 142 F.3d 353, 359 (6th Cir. 1998) (citing *Kolb v. Goldring, Inc.*, 694 F.2d 869, 875 (1st Cir. 1982)). So the Court remits the $2.8 million damages award by approximately $400,000—or, more precisely, to the extent it exceeds the figure to which the parties agreed at the charge conference.[8]

## VI.    Attorney's Fees

That leaves only Veritiv's motion for attorney's fees based on the jury's finding that Phoenix willfully and maliciously appropriated its trade secrets. Attorney's Fees Motion (DN 222) at 1. Federal and state law authorize reasonable attorney fees in cases featuring "willful and malicious misappropriation" of the trade secrets. KY. REV. STAT. § 365.886; 18 U.S.C. § 1836(b)(3)(D) (reasonable attorney's fees if "the trade secret was willfully and maliciously misappropriated").

Although Kentucky courts have yet to define "willful and malicious" misappropriation, the Sixth Circuit has affirmed a district court's instruction—materially identical to the one given here—of "behavior motivated by spite or ill will and a disregard for the rights of another with knowledge of probable injury." *Caudill Seed & Warehouse Co. v. Jarrow Formulas,* Inc., 53 F.4th 368, 395 (6th Cir. 2022); *see also* Instructions at 8–9. That definition, explained the appeals court, distinguishes intentional misappropriation, as arguably required in every trade-secret case, from cases of willful and malicious misappropriation, as required only for attorney's fees and exemplary damages awards. *See id.*

And here, the jury found—based on much of the same evidence that supported the malice finding for punitive damages—that Phoenix's misappropriation of trade

---

[8] The parties agreed at the charge conference to Veritiv's compensatory-damages cap. But in their briefing, the parties offer two (slightly) different values: $2.4 million and $2.405 million. So they may address, in supplemental briefing, any discrepancies between these two proposed amounts.

secrets was likewise "willful and malicious."  To take just two (of many) examples, the jury had reason to find that Phoenix had leaked Veritiv's pricing information and list of pending orders to a competitor, Lindenmeyr, to help siphon business from one of Veritiv's key clients.  In addition, the jury heard testimony about Phoenix's secret meetings with a client (one Veritiv had introduced, no less), at which Phoenix disclosed payment terms as part of its effort to cut Veritiv out.  That conduct goes beyond ordinary misappropriation (for a defendant's gain) because of the direct harm to Veritiv.  *Cf. Caudill Seed*, 53 F.4th at 395 (finding willful and malicious misappropriation based on use of insider information to siphon away business).  Viewing the evidence and making all inferences in Veritiv's favor, reasonable minds could conclude that Phoenix's misappropriation was willful and malicious.

And that finding entitles Veritiv to "reasonable attorney's fees."  18 U.S.C. § 1836(b)(3)(D).  Generally, "[t]he starting point for determining the amount of a reasonable attorney fee is the 'lodestar' amount, which is calculated by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate."  *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 552 (6th Cir. 2008).

Veritiv initially requested $290,920.89 in attorney's fees.  But that calculation, as Phoenix identified, contained several mathematical errors.  Veritiv conceded that point: "Admittedly, the billing spreadsheet submitted by Veritiv … do reflect a mathematical error in the formula applied to obtain the figures contained in the 'Claimed Fees for Motion' column."  Veritiv's Attorney's Fees Reply (DN 235) at 7.  Veritiv applied that erroneous figure to entries spanning over fifty pages.  The error, according to Veritiv's reply, reduced its requested damages from $290,920.89 to $204,379.54.  *Compare* Attorney's Fees Motion at 10, *with* Reply at 8.  Moreover, as Phoenix argues, Veritiv initially submitted spreadsheets that omitted multiple time entries.  These errors, and the lack of responsive briefing to revised formulas and calculations, leave this Court insufficiently equipped to assess Veritiv's requested amount.  That means that Veritiv hasn't (yet) satisfied the "key requirement … that the documentation offered in support of the hours charged must be of sufficient detail and probative value to enable the court to determine with a *high degree of certainty* that such hours were actually and reasonably expended in the prosecution of the litigation."  *Imwalle*, 515 F.3d at 552–53 (citations and quotations omitted) (emphasis added).  Lacking the requisite certainty to assess reasonableness, the Court denies Veritiv's request for attorney's fees at this time.  Veritiv may file a new motion with corrected data no later than May 15.

## ORDER

The Court therefore denies Phoenix's renewed motion for judgment as a matter of law, a new trial, and motion to amend the judgment (DN 221)—except to the extent

29

that the Court reduces the compensatory-damages award by $400,000, consistent with the parties' agreement.  The Court denies without prejudice Veritiv's motion for attorney's fees.